# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| W. CURTIS SHAIN, SCOTT IRWIN, ROBERT SPILLMAN, CEDRIC MYLES, and ANTHONY CALABRO, on behalf of themselves and all others similarly situated, | Case No. Hon. |
| **Plaintiffs,** | |
| v | CLASS ACTION |
| ADVANCED TECHNOLOGIES GROUP, LLC and SANDISK CORPORATION, | JURY TRIAL DEMAND |
| **Defendants.** | |

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs W. Curtis Shain, Scott Irwin, Robert Spillman, Cedric Myles, and Anthony Calabro, by their undersigned attorneys, bring this complaint against defendants Advanced Technologies Group, LLC ("ATG") and SanDisk Corporation ("SanDisk") (collectively "Defendants"). Plaintiffs' allegations are based upon information and belief. Plaintiffs' information and belief is based upon, among other things, an extensive investigation undertaken by their attorneys.

## NATURE OF THE ACTION

1.     Plaintiffs bring this class action on behalf of themselves and all similarly situated persons, asserting claims for violations of Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1 and 2), breach of the implied covenant of good faith and

fair dealing, unjust enrichment, conversion, unconscionability, and violations of state consumer protection laws.

2. Plaintiffs and the members of the classes they seek to represent are all released inmates of institutions run by the Federal Bureau of Prisons ("BOP") and all current inmates of institutions run by the BOP, located throughout the United States, who purchased MP3 players and music downloads (and other audio files) from ATG while incarcerated and were harmed by Defendants' unlawful, unfair, and deceptive conduct.

3. Plaintiffs, on behalf of themselves and all other similarly situated individuals, seek to recover damages and other forms of monetary relief in an amount to be determined at trial. In addition, Plaintiffs seek injunctive relief of, *inter alia*, an order directing: (a) cessation of Defendants' wrongful, anticompetitive, and deceptive practices; (b) implementation of administrative changes designed to remedy Defendants' current and future wrongful, anticompetitive, and deceptive practices; and (c) improved disclosure by Defendants to incarcerated customers and potential customers.

## JURISDICTION AND VENUE

4. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 because Plaintiffs allege violations of federal law, namely, Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and seeks treble damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15). In addition, Plaintiffs seek injunctive relief pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26).

5. The Court has supplemental subject matter jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367.

6.     The Court also has jurisdiction over this matter pursuant to 28 U.S.C. 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class are citizens of a state different from Defendants.

7.     This Court has personal jurisdiction over ATG and SanDisk because ATG and SanDisk continually and systematically transact business within the State of Michigan.

8.     Venue is proper in the Eastern District of Michigan under 28 U.S.C. 1391(b) and (c) and 15 U.S.C. §§ 15 and 22 because: (a) ATG and SanDisk transact business and/or committed an illegal or tortious act in this District; and (b) a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

**PARTIES**

9.     Plaintiff W. Curtis Shain ("Shain") is an individual residing in Louisville, Kentucky.  From March 2010 through February 2014, Shain was an inmate at FCI Elkton in Lisbon, Ohio.  Prior to his incarceration, Shain resided in Louisville, Kentucky. While incarcerated and following his release, Shain was subjected to the unlawful conduct alleged herein and has suffered damages.

10.     Plaintiff Scott Irwin is an individual residing in Belleville, Michigan. From July 2013 through April 2015, Irwin was an inmate at FCI Elkton in Lisbon, Ohio. Prior to his incarceration, Irwin resided in Brownstown, Michigan. While incarcerated and following his release, Irwin, was subjected to the unlawful conduct alleged herein and has suffered damages.

11.     Plaintiff Robert Spillman is an individual residing in Columbus, Ohio. From May 2008 through December 2014, Spillman was an inmate at FCI Morgantown in Morgantown, West Virginia. Prior to his incarceration, Spillman resided in Columbus, Ohio. While incarcerated and following his release, Spillman, was subjected to the unlawful conduct alleged herein and has suffered damages.

12.     Plaintiff Cedric Myles is an individual residing in Indianapolis, Indiana. From May 2010 through March 2014, Myles was an inmate at FCI Elkton in Lisbon, Ohio. Prior to his incarceration, Myles resided in Indianapolis, Indiana. While incarcerated and following his release, Myles, was subjected to the unlawful conduct alleged herein and has suffered damages.

13.     Plaintiff Anthony Calabro is an individual residing in Staten Island, New York. From August 2011 to June 2012, Calabro was an inmate at MDC Brooklyn. In June 2012, Calabro was transferred to FCI Fort Dix in Fort Dix, New Jersey, where he was an inmate until October 2013. Prior to his incarceration, Calabro resided in Staten Island, New York. While incarcerated and following his release, Calabro, was subjected to the unlawful conduct alleged herein and has suffered damages.

14.     Defendant ATG is organized as a Missouri Limited Liability Company with its principal office in Des Moines, Iowa.

15.     Defendant SanDisk is a Delaware corporation with its principal office in Milpitas, California.

## ADDITIONAL PERSON

16.     BOP is a United States federal law enforcement agency. A subdivision of the U.S. Department of Justice, BOP is responsible for the administration of the federal prison system.

## BACKGROUND

17.     BOP is responsible for the custody and care of more than 200,000 federal inmates confined in facilities operated and/or managed by BOP ("BOP Facilities").

18.     BOP maintains 142 facilities throughout the United States, with locations in the territory of Puerto Rico (1) and 38 states: Alabama (4), Arizona (4), Arkansas (1), California (13), Colorado (4), Connecticut (1), Florida (8), Georgia (7), Hawaii (1), Illinois (6), Indiana (1), Kansas (2), Kentucky (5), Louisiana (2), Massachusetts (1), Maryland (3), Michigan (2), Minnesota (5), Missouri (2), Mississippi (2), New Hampshire (1), New Jersey (2), New Mexico (1), New York (5), North Carolina (3), Ohio (3), Oklahoma (3), Oregon (1), Pennsylvania (10), South Carolina (4), South Dakota (1), Tennessee (2), Texas (19), Utah (1), Virginia (2), Washington (2), Wisconsin (1), and West Virginia (6).

19.     Studies have shown that keeping prisoners occupied with positive leisure-time activities, such as listening to music, benefits both prisoners and the prison system.

20.     According to BOP spokeswoman Traci Billingsley, "[t]he MP3 program is intended to help inmates deal with issues such as idleness, stress and boredom associated with incarceration." Others have emphasized the importance of music for prisoners to maintain a connection to life on the outside and eventual re-entry into society.

21.     BOP allows federal prisoners to purchase MP3 music players. For security reasons, these devices are sold with certain features disabled, such as the external memory slot and the integrated microphone ("Prison-Restricted MP3 Players"). The Prison-Restricted MP3 Players are not connected to the Internet, but instead, can be used to download approved songs through BOP's secure computer interface known as the Trust Fund Limited Inmate Computer System ("TRULINCS").

22.     TRULINCS allows inmates to, among other things: (a) send and receive secure electronic messages with BOP employees; (2) process inmate trust account transactions; (3) communicate with approved members of the public using a secured electronic messaging interface (monitored by BOP staff); (4) purchase and download various copyrighted music (all music purchases are processed through the inmate's trust account; the purchased copies and licenses do not expire and remain on the inmate's interface); and (5) manage an inmate's contacts.

## FACTUAL ALLEGATIONS RELEVANT TO ANTITRUST CLAIMS

23.     In 2012, ATG signed a $5.15 million contract with BOP, which gave ATG the exclusive right to supply Prison-Restricted MP3 Players and MP3 music and audio files to inmates in BOP Facilities (the "Exclusivity Agreement").

24.     The Exclusivity Agreement was renewed and/or extended, such that ATG is, and at all relevant times has been, the exclusive supplier of Prison-Restricted MP3 Players and MP3 audio files to inmates in BOP Facilities.

25.     As explained above, the Prison-Restricted MP3 Players that ATG sells to inmates in BOP Facilities include security features to limit the functionality of the MP3 audio player in certain respects.

26.     Buyers of Prison-Restricted MP3 Players must register their devices in the TRULINCS system every two weeks – otherwise, the Prison-Restricted MP3 Player becomes inoperable.

27.     By agreement between ATG and SanDisk, only one brand and model of MP3 music player is available for sale as a Prison-Restricted MP3 Player: SanDisk's Sansa Clip+.

28.     In or around 2012, SanDisk and ATG agreed that SanDisk would be the exclusive supplier of Prison-Restricted MP3 Players to ATG.  Pursuant to this agreement, SanDisk places physical and technological locks and restrictions on the MP3 players it supplies, with the specific knowledge and/or intent that those Prison-Restricted MP3 Players are sold by ATG to inmates in BOP Facilities.

29.     Inmates pay a substantially higher price for SanDisk's Sansa Clip+ than the retail price outside of prison – approximately double (or more).  ATG sells the SanDisk Prison-Restricted MP3 Player to inmates at a cost of approximately $70 to $90 (depending on the BOP facility).

30.     Consumers of SanDisk Prison-Restricted MP3 Players bought from ATG can purchase as many as 1,500 songs to download and play on a SanDisk Prison-Restricted MP3 Player, but only through TRULINCS.

31.     Songs can be purchased through TRULINCS for download onto ATG's SanDisk Prison-Restricted MP3 Player at a per-song cost of $0.80, $1.20, or $1.80, depending on the song. Accordingly, a purchaser of a SanDisk Prison-Restricted MP3 Player could spend between $1,200 and $2,700 on music to download the maximum capacity of songs onto a SanDisk Prison-Restricted MP3 Player. MP3 audio books can

also be purchased and downloaded through TRULINCS and onto a SanDisk Prison-Restricted MP3 Player at a price per download that is significantly higher than the per download price for song files.

32.     According to data released by ATG, it has sold Prison-Restricted MP3 Players and MP3 audio files to populate those players to approximately forty percent (40%) of all federal inmates.

33.     The average number of inmates released from BOP Facilities each year exceeds 50,000 inmates. Based on ATG's sales of Prison-Restricted MP3 Players to approximately forty percent (40%) of inmates in BOP Facilities, approximately 20,000 inmates released each year from BOP Facilities purchased a SanDisk Prison-Restricted MP3 Player from ATG prior to release from prison ("Released Purchasers").

34.     There are many different MP3 audio players available for sale on the open market outside of prison from a variety of manufacturers, for different prices, with different memory capacities, and with various features and software options – such as, for example, the SanDisk Sansa Clip+, the Sony Walkman MP3 player, and the Apple iPod Nano, among others.

35.     In the market for the sale of MP3 audio players to Released Purchasers ("Post-Release MP3 Players"), Released Purchasers in theory have the option of purchasing any one of many MP3 audio players available for purchase on the open market. Released Purchasers, just like other consumers of MP3 players outside of prison, should be able to rely on any number of motivating factors engendered by competition in the marketplace to determine which Post-Release MP3 Player to purchase, including price, memory capacity, software capabilities, design, compatibility with other devices

(like computers), ease of downloading songs, ease of transferring files between devices, and other factors.

36.     Unlike members of the general public seeking to purchase an MP3 player, Released Purchasers are subject to a distinct disadvantage: unless they purchase Post-Release MP3 Players from ATG, they will ***not*** have access to any of the songs or other audio files that they purchased during their incarceration ("Purchased Music Collection") – songs or other audio files they previously paid for in amounts that could total as much as $2,700.

37.     As explained further below, not only does ATG fail to disclose this material fact (among others) to inmates before or at the time that they purchase both Prison-Restricted MP3 Players and song and audio files from ATG, the disclosures that are first made to inmates after they purchase the Prison-Restricted MP3 Players are deceptive, misleading, and inadequate.

38.     In addition, this ATG-imposed requirement represents a virtually complete barrier to entry into the market for Post-Release MP3 Players because the expense of replacing a Released Purchaser's entire Purchased Music Collection in order to populate a Post-Release MP3 Player purchased from a source other than ATG constitutes a cost-prohibitive switching cost. The result is an impermissible tie of the purchase of a SanDisk Post-Release MP3 Player from ATG to the initial purchase of the Released Purchaser's SanDisk Prison-Restricted MP3 Player and the purchase of the Released Purchaser's Purchased Music Collection.

39.     SanDisk, in addition to being ATG's exclusive supplier of Prison-Restricted MP3 Players, is also ATG's exclusive supplier of Post-Release MP3 Players.

Pursuant to the continuing agreement between ATG and SanDisk, which began in 2012, SanDisk provides Post-Release MP3 Players to ATG with the specific knowledge and/or intent that they be sold to Released Purchasers as a requirement for those Released Purchasers being able to retain their Purchased Music Collections.

40.     ATG accomplishes its impermissible tie by forcing the Released Purchaser to buy a SanDisk Post-Release MP3 Player – one that will operate outside a BOP facility and does not include security features that limit certain functions of Prison-Restricted MP3 Players (but ***not*** the ability to listen to music) – from ATG as a condition of a Released Purchaser's ability to keep or use any of the Purchased Music Collection after his or her release from prison.  As a result of a technological "lock" that is included in SanDisk Prison-Restricted MP3 Players purchased from ATG, the only way for a Released Purchaser to retain and use his or her Purchased Music Collection after release from prison is to purchase a SanDisk Post-Release MP3 Player from ATG.

41.     ATG misleadingly describes its sale (and the Released Purchaser's purchase) of a SanDisk Post-Release MP3 Player from ATG as "deinstitutionalization," which is nothing more than ATG's sale of a SanDisk Post-Release MP3 Player under the guise of a security procedure that is not necessary to enable Released Purchasers to keep their Purchased Music Collection. ATG accomplishes this by charging Released Purchasers to either: (a) "convert" an inmate's SanDisk Prison-Restricted MP3 Player into a SanDisk Post-Release MP3 Player; or (b) provide a new SanDisk Post-Release MP3 Player that is loaded with the Released Purchaser's Purchased Music Collection if an inmate's SanDisk Prison-Restricted MP3 Player is missing, not working, or out of warranty.

42.     ATG charges Released Purchasers up to $110 to purchase these SanDisk Post-Release MP3 Players, on top of both the $70 to $90 that they initially paid while incarcerated to purchase the SanDisk Prison-Restricted MP3 Player and the up to $2,700 that they paid while incarcerated to purchase the Purchased Music Collection. ATG knows it is extremely unlikely that any inmate would make the expensive initial outlay of $70 to $90 for a Prison-Restricted MP3 Player capable of holding 1,500 songs without then purchasing a substantial Purchased Music Collection to populate that MP3 player.

43.     The fact that ATG can easily transfer a Released Purchaser's Purchased Music Collection to a brand new device that never had any "security" features installed on it demonstrates that the so-called process of "deinstitutionalization" of a SanDisk Prison-Restricted MP3 Player is a sham and anticompetitive.

44.     ATG does not allow a Released Purchaser to retain copies of the Purchased Music Collection through any method other than the purchase of a SanDisk Post-Release MP3 Player from ATG. ATG's "Post Release Deinstitutionalization Terms of Service for MP3 Player" ("Post-Release Terms") states that "ATG will not restore any content to a third party player," thereby establishing a refusal to deal with Released Purchasers who desire to purchase Post-Release MP3 Players from a retailer other than ATG.

45.     In addition, ATG further coerces Released Purchasers into buying ATG's SanDisk Post-Release MP3 Player by limiting the period during which the Released Purchaser may recover the Purchased Music Collection: if a Released Purchaser does not buy a SanDisk Post-Release MP3 Player from ATG within one (1) year of release from

prison, the Released Purchaser will forever be foreclosed from regaining ownership and possession of his Purchased Music Collection.

46.     ATG's message to Released Purchasers is clear: purchase your SanDisk Post-Release MP3 Player from ATG, and do it quickly, or lose your entire Purchased Music Collection, which could be as much as $2,700 – far more than the approximate cost of the ATG/SanDisk Post-Release MP3 Player itself.

47.     ATG's "deinstitutionalization" procedure enables ATG to hold hostage a Released Purchaser's Purchased Music Collection until the Released Purchaser makes the required purchase of a SanDisk Post-Release MP3 Player from ATG.

48.     ATG holds Plaintiffs' and class members' Purchased Music Collections hostage, leaving Plaintiffs and class members with only one economic and realistic choice to retrieve their music: a Released Purchaser must purchase a SanDisk Post-Release MP3 Player from ATG. The cost of switching to a Post-Release MP3 Player purchased from any source other than ATG – *to wit*, the cost of replacing the entire Purchased Music Collection – is so high that the Released Purchasers are "locked-in" to purchasing ATG's SanDisk Post-Release MP3 Player after they are released.

49.     The relevant geographic market is the United States in as much as ATG does business throughout the United States, including, without limitation, by virtue of ATG's contractual relationship with BOP, which is responsible for the custody and care of the approximately 200,000 federal inmates confined in BOP Facilities throughout the United States, to whom ATG markets and sells Prison-Restricted MP3 Players.

50.     ATG's business activities that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

51.     At all relevant times, ATG transacted business in a continuous and uninterrupted flow of interstate commerce throughout the United States.

## FACTUAL ALLEGATIONS RELEVANT TO ALL OTHER CLAIMS

**Defendants Fail to Disclose Material Facts to Inmates Before or at the Time of Purchase**

52.     ATG offers SanDisk Prison-Restricted MP3 Players for sale by including the item on the BOP-operated facility's "Commissary List" of items for sale, which also lists other items available for purchase by inmates such as toothpaste, stamps, snacks, pens, and clothing, among others. The Commissary List, however, does not disclose the existence of terms associated with the SanDisk Prison-Restricted MP3 Players being offered for sale.

53.     Purchasers of SanDisk Prison-Restricted MP3 Players are not provided with warranty information – set forth in the "SanDisk Manufacturer's Limited Warranty" ("Warranty"), "End-User License Agreement," and "Warranty Process and Card" (collectively, "Agreements") – until *after* purchasing and receiving the Prison-Restricted MP3 Player.

54.     Purchasers of SanDisk Prison-Restricted MP3 Players are also not provided with ATG's Post-Release Terms (*see supra* at ¶ 44) – informing them of the material fact that if, when they become Released Purchasers, they do not purchase their SanDisk Post-Release MP3 Players from ATG, "ATG will not restore any content to a third party player" (or, that they will lose access to their Purchased Music Collection) – until *after* they purchase and receive the SanDisk Prison-Restricted MP3 Player.

**Defendants' Deceptive Disclaimer and Modification of Warranty Coverage**

55.     SanDisk's Warranty, given with the SanDisk Prison-Restricted MP3 Player and expressly incorporated by reference into ATG's Post-Release Terms, is a one-year limited warranty providing as follows:

> SanDisk warrants to the end-user that this product, excluding content and/or software supplied with or on the product, will be free from material defects in manufacture, will conform to SanDisk's published product specifications and be fit for normal use during the Warranty Period on the table commencing on the date of purchase provided that the product is legally placed on the market.  To make a warranty claim please follow the process defined in section Warranty Process and Card.

56.     ATG, on behalf of itself and its "supplier," SanDisk, also uses its Post-Release Terms to unconscionably and deceptively modify and disclaim the one-year product warranty that comes with SanDisk Prison-Restricted and Post-Release MP3 Players.

57.     The Post-Release Terms state that "ATG's liability under any legal theory for any loss or damage in any way related to this product shall in no event exceed the sales price of the MP3 Player and any claims for loss or User Data is excluded."

58.     The Post-Release Terms further state:

> ATG ***AND ITS SUPPLIERS*** DISCLAIM ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, OR OTHERWISE WITH RESPECT TO THE PRODUCT OR SERVICES AND ACCOMPANYING WRITTEN MATERIALS INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.   THERE IS NO WARRANTY OF NON-INFRINGEMENT, TITLE OR QUIET ENJOYMENT. IF APPLICABLE LAW IMPLIES ANY WARRANTIES WITH RESPECT TO THE PRODUCT, ALL SUCH WARRANTIES ARE LIMITED IN DURATION TO SIXTY (60) DAYS FROM THE DATE OF SERVICE. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY ATG, ITS DISTRIBUTORS, AGENTS OR EMPLOYEES SHALL CREATE A WARRANTY OR IN ANY WAY INCREASE THE SCOPE OF THIS WARRANTY.

59.     In other words, ATG and its suppliers (including SanDisk) purport to revoke the balance of the one-year warranty, disclaim the manufacturer's warranty altogether, and/or shorten the duration of the implied warranty of merchantability to a period of only sixty (60) days from the date of "deinstitutionalization."

60.     SanDisk's website includes information about, and links to, the Post-Release Terms and other documents and information corroborating SanDisk's and ATG's agreement to revoke, disclaim and modify SanDisk's manufacturer's warranty in connection with so-called "deinstitutionalization" (http://kb.sandisk.com/ app/answers/detail/a_id/12839/~/atg-mp3-player-deinstitutionalization-and warranty-processing).

61.     In addition, ATG misleadingly and deceptively fails to disclose at the time of purchase that it will revoke, shorten, and/or disclaim the warranty and implied warranties in connection with MP3 Player "deinstitutionalization."

**Defendants' Disclosures are Inadequate and Unconscionable**

62.     Even if the disclosures described above were adequate (which they are not) and not deceptive or misleading (which they are), by the time inmates receive the Agreements and Post-Release Terms, the disclosures cannot be considered by an inmate in deciding whether or not to purchase a SanDisk Prison-Restricted MP3 Player because, as a matter of prison policy, inmates cannot return any items purchased at the Commissary unless the item is physically defective. For that purpose, therefore, the "disclosures" are meaningless.

63.     In addition, the material fact that inmates will lose access to their Purchased Music Collection unless they purchase SanDisk Post-Release MP3 Players

from ATG is not disclosed to inmates prior to an inmate's purchase of both: (a) a SanDisk Prison-Restricted MP3 Player; and (b) music and audio files.

64.     The Agreements and Post-Release Terms, which are single-spaced documents containing impermissibly tiny and ambiguous terms, are wholly inadequate and ineffective for members of the putative Classes, as about 41 percent of the nation's incarcerated have less than a high school education.[1]

65.     The Agreements and Post-Release Terms are procedurally and substantively unconscionable and unenforceable under the laws of the states in which ATG does business in that, *inter alia*, to the extent that they may be deemed contracts, they are contracts of adhesion in that they are standardized forms, imposed and drafted by ATG, which is a party of vastly superior bargaining strength, and presented to inmate-consumers on a "take it or leave it" basis and because it leads to overly harsh results for inmate-consumers.

66.     From March 2010 through February 2014, Plaintiff Shain was incarcerated within the BOP at FCI Elkton in Lisbon, Ohio.

67.     Prior to his incarceration, Shain resided in Louisville, Kentucky.

68.     From July 2013 through April 2015, Plaintiff Irwin was incarcerated within the BOP at FCI Elkton in Lisbon, Ohio.

69.     Prior to his incarceration, Irwin resided in Brownstown, Michigan.

70.     From May 2008 through December 2014, Plaintiff Spillman was incarcerated within the BOP at FPC Morgantown in Morgantown, West Virginia.

---

[1] Hawlow, Caroline Wolf, *Education and Correctional Populations*, U.S. Department of Justice, Bureau of Justice Statistics Special Report, January 2003.

71.     Prior to his incarceration, Spillman resided in Columbus, Ohio.

72.     From May 2010 through March 2014, Plaintiff Myles was incarcerated within the BOP at FCI Elkton in Lisbon, Ohio.

73.     Prior to his incarceration, Myles resided in Indianapolis, Indiana.

74.     From August 2011 through October 2013, Plaintiff Calabro was incarcerated within the BOP at MDC Brooklyn and FCI Fort Dix.

75.     Prior to his incarceration, Calabro resided in Staten Island, New York.

76.     During their incarceration, Plaintiffs and all members of the class purchased SanDisk Prison-Restricted MP3 Players from ATG.

77.     The Plaintiffs and all members of the class were not given the Agreements related to their purchases until after they purchased and received their SanDisk Prison-Restricted MP3 Players.

78.     During their incarceration, Plaintiffs and all members of the class also purchased MP3's and other audio files, constituting their Purchased Music Collection.

79.     The Plaintiffs and all members of the class were also not provided with ATG's Post-Release Terms – and were not informed of the material fact that if, when they are released, they do not purchase a SanDisk Post-Release MP3 Player from ATG, "ATG will not restore any content to a third party player" (or, in other words, that they will lose access to their Purchased Music Collection) – until after they purchased and received the SanDisk Prison-Restricted MP3 Player.

80.     The Plaintiffs and all members of the class have been deprived of their Purchased Music Collection by Defendants.

81.     The Plaintiffs and all members of the class have sustained economic injury as a result of Defendants' wrongdoing.

## CLASS ACTION ALLEGATIONS

82.     This is a class action which seeks to: (1) enjoin Defendants' violations of federal antitrust law; (2) enjoin Defendants' violations of state consumer protection statutes and common law; and (3) award any and all relief and damages available for Defendants' wrongful acts.

83.     Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2) and (b)(3) on behalf of themselves and on behalf of all other similarly situated individuals and seek to represent the following classes and subclasses (collectively "Classes" unless specified):

(a)     All released inmates of institutions run by the Federal Bureau of Prisons located throughout the United States who purchased MP3 players and music and audio files while incarcerated (the "Released Purchaser National Class");

(b)     All current inmates of institutions run by the Federal Bureau of Prisons located throughout the United States who purchased MP3 players and audio files while incarcerated (the "Incarcerated National Class");

(c)     All current and released inmates of institutions run by the Federal Bureau of Prisons located throughout the United States who purchased MP3 players and music while incarcerated and who resided in the State of Michigan prior to their incarceration (the "Michigan Subclass");

(d)     All current and released inmates of institutions run by the Federal Bureau of Prisons located throughout the United States who purchased MP3 players and music while incarcerated and who resided in the State of Kentucky prior to their incarceration (the "Kentucky Subclass");

(e)     All current and released inmates of institutions run by the Federal Bureau of Prisons located throughout the United States

who purchased MP3 players and music while incarcerated and who resided in the State of Ohio prior to their incarceration (the "Ohio Subclass");

(f) All current and released inmates of institutions run by the Federal Bureau of Prisons located throughout the United States who purchased MP3 players and music while incarcerated and who resided in the State of Indiana prior to their incarceration (the "Indiana Subclass"); and

(g) All current and released inmates of institutions run by the Federal Bureau of Prisons located throughout the United States who purchased MP3 players and music while incarcerated and who resided in the State of New York prior to their incarceration (the "New York Subclass").

84.   The Class Period is defined as the time period applicable under the claims to be certified.

85.   Excluded from the Classes are Defendants, their assigns, successors, legal representatives, and any entities in which Defendants have a controlling interest.

86.   Plaintiffs reserve the right to revise these class definitions and to add additional subclasses as appropriate based on facts learned as the litigation progresses.

87.   **Numerosity:** The Classes are sufficiently numerous that joinder of all members is impracticable. The exact number and addresses of the members of the proposed Classes is unknown and is not available to Plaintiffs at this time, however, according to ATG, more than forty percent (40%) of inmates in BOP Facilities (*i.e.*, thousands of inmates) have purchased SanDisk Prison-Restricted MP3 Players. The number and identity of class members is readily definable and one that can easily be determined from the records maintained by the BOP, ATG, SanDisk, and/or their agents. The disposition of their claims in a class action will be of benefit to the parties and to the Court.

88.     **Commonality:**  Numerous questions of law and fact are common to the claims of Plaintiffs and the members of the proposed Classes. These include, but are not limited to, whether:

a.   ATG, aided by SanDisk, impermissibly ties the purchase of a SanDisk Post-Release MP3 Player from ATG to the initial purchase of the Released Purchaser's SanDisk Prison-Restricted MP3 Player;

b.   ATG, aided by SanDisk, impermissibly ties the purchase of a SanDisk Post-Release MP3 Player from ATG to the initial purchase of MP3 music and audio files that make up Released Purchasers' Purchased Music Collections;

c.   ATG has appreciable economic power in the market for Prison-Restricted MP3 Players;

d.   SanDisk impermissibly benefits from ATG's appreciable economic power in the market for Prison-Restricted MP3 Players, and through its relationship with ATG, SanDisk also has appreciable economic power in the market for Prison-Restricted MP3 Players.

e.   ATG has appreciable economic power in the market for the sale of MP3 music and other audio files to inmates in BOP Facilities;

f.   ATG has monopoly power in the market for Post-Release MP3 Players;

g.   ATG violates Sections 1 and 2 of the Sherman Antitrust Act;

h.   SanDisk violates Sections 1 and 2 of the Sherman Antitrust Act;

i.   ATG, aided by SanDisk, fails to disclose to inmates before or at the time that they purchase SanDisk Prison-Restricted MP3 Players that unless Released Purchasers purchase their SanDisk Post-Release MP3 Players from ATG within one year

of their release, they will permanently lose all of the MP3 music and audio files in their Purchased Music Collection;

j.   Defendants unconscionably modify and disclaim the product warranty that comes with SanDisk Prison-Restricted MP3 Players;

k.   Defendants fail to disclose the existence or terms of any warranty associated with the SanDisk Prison-Restricted MP3 Players being offered for sale until after inmates purchase and receive the SanDisk Prison-Restricted MP3 Player;

l.   Defendants violated the consumer protection statutes applicable to each subclass;

m. ATG, aided by SanDisk, converts the MP3 music and audio file downloads purchased by Plaintiffs and the members of the Classes;

n.   Defendants breach the implied covenant of good faith and fair dealing with Plaintiffs and all others similarly situated by, *inter alia*, engaging in the acts and practices alleged herein;

o.   Defendants' form contracts entered into with Plaintiffs and the members of the Classes, or any of the terms therein, are void and unenforceable;

p.   Defendants are being unjustly enriched by engaging in the acts and practices alleged herein;

q.   Plaintiffs and members of the Classes have been and continue to be damaged by Defendants' alleged misconduct and, if so, the proper measure of their damages; and

r.   Defendants engage in practices that warrant equitable and injunctive relief.

89.    **Typicality:**  Plaintiffs' claims are typical of the claims of all members of the proposed Classes. Plaintiffs and all members of the proposed Classes were damaged by the same wrongful conduct of Defendants as alleged herein and the relief sought is common to the proposed Classes. The claims of Plaintiffs and all other members of the proposed Classes arise out of the same alleged unlawful conduct.

90.    **Adequacy of Representation:** Plaintiffs are committed to the vigorous prosecution of this action. Plaintiffs will fairly and adequately protect the interests of the members of the proposed Classes, and Plaintiffs' interests are coincident with and not antagonistic to the other members of the proposed Classes who they seek to represent. Plaintiffs have retained counsel competent and experienced in class action, antitrust, consumer, and other complex litigation.

91.    **Predominance and Superiority:**   Questions of law common to the members of the Classes predominate over any questions affecting only individual members with respect to some or all issues presented in this Complaint. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual litigation of the claims of all members of the Classes is impracticable because the cost of litigation would be prohibitively expensive for each member of the Classes and would impose an immense burden upon the courts.  However cumulatively, the amount of potential damage is significant and injunctive relief is required to preclude the Defendants' ongoing wrongful conduct.

92.    **Prevention of Inconsistent or Varying Adjudications:**  Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system

resulting from multiple trials of the same complex factual and legal issues. By contrast, the conduct of this action as a class action, with respect to some or all of the issues presented in this Complaint, presents fewer management difficulties, conserves the resources of the parties and of the court system, and is the only means to protect the rights of all members of the Classes.

93.     Defendants have acted and will act on grounds generally applicable to the Classes as a whole, and Plaintiffs seek, *inter alia*, equitable remedies including final injunctive relief with respect to the Classes as a whole.

94.     The likelihood that individual members of the Classes will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.  Plaintiffs are not likely to be able to vindicate and enforce their rights unless this action is maintained as a class action.

95.     Plaintiffs' counsel, who are highly experienced in class actions, foresee little difficulty in the management of this case as a class action.

**COUNT I**
**Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1:**
**Unlawful Tying: *Per Se* (Prison-Restricted MP3 Players)**
**(On Behalf of the Released Purchaser National Class)**

96.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

97.     ATG's conduct in requiring Released Purchasers to purchase SanDisk Post-Release MP3 Players from ATG as a condition to the ability to keep or use any of the Released Purchaser's Purchased Music Collection after his or her release from prison constitutes a tying arrangement in *per se* violation of Section 1 of the Sherman Act, 15

U.S.C. § 1, which has directly and proximately caused economic injury to Plaintiffs in an amount to be proven at trial.

98.    The tying product is the SanDisk Prison-Restricted MP3 Player, which ATG has the exclusive right to sell to inmates in BOP Facilities throughout the United States as a result of its Exclusivity Agreement with the BOP.

99.    The Exclusivity Agreement constitutes a complete barrier to entry for potential competitors for the sale of Prison-Restricted MP3 Players, giving ATG appreciable economic power in the market for sale of Prison-Restricted MP3 Players to inmates in BOP Facilities.  ATG imposes on such purchasers an undisclosed (and, thus, unforeseeable) restriction upon their access to a necessary by-product of their purchases after release from prison – their Purchased Music Collection.

100.    The tied product is the SanDisk Post-Release MP3 Player, which ATG markets to Released Purchasers and which ATG requires Released Purchasers to buy in order to retain ownership and possession of the MP3 music and other audio files that the Released Purchasers bought prior to release from prison and that make up their Purchased Music Collections, consisting of up to 1,500 songs, or up to approximately $2,700.00 worth of MP3 files.

101.    Prison-Restricted MP3 Players, which are subject to the physical and technological restrictions and modifications described above, are separate and distinct products from Post-Release MP3 Players, which are not subject to those physical and/or technological restrictions.

102.    ATG's unilaterally imposed requirement that Released Purchasers purchase SanDisk Post-Release MP3 Players from ATG is an unlawful exploitation of

ATG's control over the tying product to restrain trade in the market for the tied product by forcing the Released Purchasers into the purchase of a tied product (a SanDisk Post-Release MP3 Player) from ATG, regardless of the fact that the Released Purchaser might have preferred to purchase a Post-Release MP3 Player elsewhere on different terms, as evidenced by, among other things, the fact that purchasers of the tying product who are subsequently released from prison (Released Purchasers) are thereafter permanently deprived of their up to $2,700 worth of MP3 audio files (*i.e.*, their Purchased Music Collection) unless they first purchase the tied product from ATG within one year of their release.

103.   In other words, ATG and SanDisk's imposition of a technological lock, making purchase of the tied product from ATG (as opposed to any of ATG's many competitors in the tied product market) a prerequisite to a Released Purchaser's ability to retain ownership and possession of his or her Purchased Music Collection, means that a Released Purchaser's only economically viable option is to purchase both the tying and the tied product.

104.   ATG's actions associated with the tying of SanDisk Prison-Restricted MP3 Players to the purchase of SanDisk Post-Release MP3 Players have affected a not insubstantial amount of interstate commerce in the market for the tied products.  Among other things, based on ATG's sales of SanDisk Prison-Restricted MP3 Players to approximately forty percent (40%) of inmates in BOP Facilities, approximately 20,000 inmates released each year from BOP Facilities purchased a Prison-Restricted MP3 Player from ATG prior to release from prison.  Each of those Released Purchasers, upon his or her release, is faced with the "Hobson's Choice" of purchasing a SanDisk Post-

Release MP3 Player from ATG or forfeiting up to $2,700 worth of audio content in his or her Purchased Music Collection (representing many millions of dollars).

105.    Each and every member of the Released Purchaser National Class has been damaged by ATG's anticompetitive and unlawful tying arrangement.

106.    Purchases of SanDisk Post-Release MP3 Players from ATG are ordered and fulfilled through the mail and, in most cases, across state lines. Purchases of audio files comprising the Purchased Music Collections are made over TRULINCS (which operates throughout BOP's nation-wide system of institutions) and, therefore, are also concluded across state lines.

107.    Pursuant to 15 U.S.C. § 15, in addition to actual damages, Plaintiffs and all other members of the Released Purchaser National Class are entitled to recover from ATG treble damages and attorney's fees for the above-described *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### COUNT II
### Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1:
### Unlawful Tying: Rule of Reason (Prison-Restricted MP3 Players)
### (On Behalf of the Released Purchaser National Class)

108.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

109.    Alternatively, the above-described actions of ATG associated with the tying of SanDisk Prison-Restricted MP3 Players to the purchase of SanDisk Post-Release MP3 Players constitute a tying arrangement in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 under a Rule of Reason analysis, which has directly and proximately caused economic injury to Plaintiffs in an amount to be proven at trial.

26

110.    The tying product is the SanDisk Prison-Restricted MP3 Player, which ATG has the exclusive right to sell to inmates in BOP Facilities throughout the United States as a result of its Exclusivity Agreement with the BOP.

111.    The Exclusivity Agreement constitutes a complete barrier to entry for potential competitors for the sale of Prison-Restricted MP3 Players, giving ATG appreciable economic power in the market for sale of Prison-Restricted MP3 Players to inmates in BOP Facilities.  ATG imposes on such purchasers an undisclosed (and, thus, unforeseeable) restriction upon their access to a necessary by-product of their purchases after release from prison – their Purchased Music Collection.

112.    The tied product is the SanDisk Post-Release MP3 Player, which ATG markets to Released Purchasers and which ATG requires Released Purchasers to buy in order to retain ownership and possession of the MP3 music and other audio files that the Released Purchasers bought prior to release from prison and that make up their Purchased Music Collections, consisting of up to 1,500 songs, or up to approximately $2,700.00 worth of MP3 files.

113.    Prison-Restricted MP3 Players, which are subject to the physical and technological restrictions and modifications described above, are separate and distinct products from Post-Release MP3 Players, which are not subject to any physical and/or technological restrictions.

114.    ATG's unilaterally imposed requirement that Released Purchasers purchase SanDisk Post-Release MP3 Players from ATG is an unlawful exploitation of ATG's control over the tying product to restrain trade in the market for the tied product by forcing the Released Purchasers into the purchase of a tied product (a SanDisk Post-

Release MP3 Player) from ATG, regardless of the fact that the Released Purchaser might have preferred to purchase a Post-Release MP3 Player elsewhere on different terms, as evidenced by, among other things, the fact that purchasers of the tying product who are subsequently released from prison (Released Purchasers) are thereafter permanently deprived of their up to $2,700 worth of MP3 audio files (*i.e.*, their Purchased Music Collection) unless they first purchase the tied product from ATG within one year of their release.

115.    In other words, ATG and SanDisk's imposition of a technological lock, making purchase of the tied product from ATG (as opposed to any of ATG's many competitors in the tied product market) a prerequisite to a Released Purchaser's ability to retain ownership and possession of his or her Purchased Music Collection, means that a Released Purchaser's only economically viable option is to purchase both the tying and the tied product.

116.    ATG's actions associated with the tying of SanDisk Prison-Restricted MP3 Players to the purchase of SanDisk Post-Release MP3 Players have affected a not insubstantial amount of interstate commerce in the market for the tied products.  Among other things, based on ATG's sales of SanDisk Prison-Restricted MP3 Players to approximately forty percent (40%) of inmates in BOP Facilities, approximately 20,000 inmates released each year from BOP Facilities purchased a SanDisk Prison-Restricted MP3 Player from ATG prior to release from prison.  Each of those Released Purchasers, upon his or her release, is faced with the "Hobson's Choice" of purchasing a SanDisk Post-Release MP3 Player from ATG or forfeiting up to $2,700 worth of audio content in his or her Purchased Music Collection (representing many millions of dollars).

117.    In light of the substantial investment that purchasers of SanDisk Prison-Restricted MP3 Players make in their Purchased Music Collections, ATG's imposition of an unforeseeable restriction of the ability to access the Purchased Music Collection after release from prison has put all rational buyers in the market for Post-Release MP3 Players in the position of having only one economically viable option – the purchase from ATG of both the tying product (a SanDisk Prison-Restricted MP3 Player) and the tied product (a SanDisk Post-Release MP3 Player). The result is that all of ATG's competitors in the market for Post-Release MP3 Players are excluded from sales to Released Purchasers, constituting an unreasonable restraint on competition in the market for Post-Release MP3 Players.

118.    Each and every member of the Released Purchaser National Class has been damaged by ATG's anticompetitive and unlawful tying arrangement.

119.    Purchases of SanDisk Post-Release MP3 Players from ATG are ordered and fulfilled through the mail and, in most cases, across state lines. Purchases of audio files comprising the Purchased Music Collections are made over TRULINCS (which operates throughout BOP's nation-wide system of institutions) and, therefore, are also concluded across state lines.

120.    Pursuant to 15 U.S.C. § 15, in addition to actual damages, Plaintiffs and all other members of the Released Purchaser National Class are entitled to recover from ATG treble damages and attorney's fees for the above-described violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**COUNT III**
**Conspiracy to Violate Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1:**
**Unlawful Tying: *Per Se* (Prison-Restricted MP3 Players)**
**(On Behalf of the Released Purchaser National Class)**

121.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

122.    ATG and SanDisk's conduct in requiring Released Purchasers to purchase SanDisk Post-Release MP3 Players from ATG as a condition to the ability to keep or use any of the Released Purchaser's Purchased Music Collection after his or her release from prison constitutes a conspiracy to effect a tying arrangement in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, which has directly and proximately caused economic injury to Plaintiffs in an amount to be proven at trial.

123.    ATG and SanDisk agreed and conspired to violate Section 1 of the Sherman Act, 15 U.S.C. § 1, through this unlawful tying arrangement, as evidenced by, among other things (i) the continuing agreement, beginning in or about 2012, between ATG and SanDisk that only SanDisk's Sansa Clip+ would be available for sale as a Prison-Restricted MP3 Player, (ii) the continuing agreement, beginning in or about 2012, between ATG and SanDisk to place physical and technological locks and restrictions on all Prison-Restricted MP3 Players with the specific knowledge and intent that those Prison-Restricted MP3 Players would be sold by ATG to inmates in BOP Facilities, (iii) ATG's and SanDisk's joint disclaimer and modification, in the Post-Release Terms, of the one-year product warranty that comes with SanDisk Prison Restricted MP3 Players, (iv) the continuing agreement, beginning in or about 2012, between ATG and SanDisk that SanDisk would be the exclusive supplier of Post-Release MP3 Players to ATG with the specific knowledge and/or intent that they be sold to Released Purchasers as a

requirement for those Released Purchasers being able to retain their Purchased Music Collection, and (v) SanDisk's inclusion on its website of information about, and links to, the Post-Release Terms and other documents and information concerning the so-called "deinstitutionalization" process.

124.   The tying product is the SanDisk Prison-Restricted MP3 Player, which ATG has the exclusive right to sell to inmates in BOP Facilities throughout the United States as a result of its Exclusivity Agreement with the BOP.

125.   The Exclusivity Agreement constitutes a complete barrier to entry for potential competitors for the sale of Prison-Restricted MP3 Players, giving ATG appreciable economic power in the market for sale of Prison-Restricted MP3 Players to inmates in BOP Facilities.  ATG imposes on such purchasers an undisclosed (and, thus, unforeseeable) restriction upon their access to a necessary by-product of their purchases after release from prison – their Purchased Music Collection.

126.   The tied product is the SanDisk Post-Release MP3 Player, which ATG markets to Released Purchasers and which ATG requires Released Purchasers to buy in order to retain ownership and possession of the MP3 music and other audio files that the Released Purchasers bought prior to release from prison and that make up their Purchased Music Collections, consisting of up to 1,500 songs, or up to approximately $2,700.00 worth of MP3 files.

127.   Prison-Restricted MP3 Players, which are subject to the physical and technological restrictions and modifications described above, are separate and distinct products from Post-Release MP3 Players, which are not subject to those physical and/or technological restrictions.

128.    Because ATG only sells physically and technologically locked SanDisk MP3 players to inmates in BOP Facilities, SanDisk's supply of MP3 players to ATG enables ATG's appreciable economic power in the market for the sale of Prison-Restricted MP3 Players, which also enables ATG to tie the purchase of SanDisk Post-Release MP3 Players. Through this arrangement, SanDisk functionally also has appreciable market power in the market for sale of Prison-Restricted MP3 Players and improperly benefits from the tying of those products to the purchase of SanDisk Post-Release MP3 Players.

129.    ATG's unilaterally imposed requirement that Released Purchasers purchase SanDisk Post-Release MP3 Players from ATG is an unlawful exploitation of ATG's control over the tying product to restrain trade in the market for the tied product by forcing the Released Purchasers into the purchase of a tied product (a SanDisk Post-Release MP3 Player) from ATG, regardless of the fact that the Released Purchaser might have preferred to purchase a Post-Release MP3 Player elsewhere on different terms, as evidenced by, among other things, the fact that purchasers of the tying product who are subsequently released from prison (Released Purchasers) are thereafter permanently deprived of their up to $2,700 worth of MP3 audio files (*i.e.*, their Purchased Music Collection) unless they first purchase the tied product from ATG within one year of their release.

130.    In other words, ATG and SanDisk's imposition of a technological lock, making purchase of the tied product from ATG (as opposed to any of ATG's many competitors in the tied product market) a prerequisite to a Released Purchaser's ability to retain ownership and possession of his or her Purchased Music Collection, means that a

Released Purchaser's only economically viable option is to purchase both the tying and the tied product.

131.    SanDisk's exclusive supply of Post-Release MP3 Players to ATG enables ATG's tying and restraint of trade in the market for Post-Release MP3 Players. SanDisk improperly benefits from its contribution to the above-described tying arrangement through ATG's exclusive, market-restrained sales of SanDisk Post-Release MP3 Players.

132.    ATG and SanDisk's actions associated with the tying of Prison-Restricted MP3 Players to the purchase of Post-Release MP3 Players have affected a not insubstantial amount of interstate commerce in the market for the tied products.  Among other things, based on ATG's sales of SanDisk Prison-Restricted MP3 Players to approximately forty percent (40%) of inmates in BOP Facilities, approximately 20,000 inmates released each year from BOP Facilities purchased a SanDisk Prison-Restricted MP3 Player from ATG prior to release from prison.  Each of those Released Purchasers, upon his or her release, is faced with the "Hobson's Choice" of purchasing a SanDisk Post-Release MP3 Player from ATG or forfeiting up to $2,700 worth of audio content in his or her Purchased Music Collection (representing many millions of dollars).

133.    Each and every member of the Released Purchaser National Class has been damaged by ATG and SanDisk's anticompetitive and unlawful tying arrangement.

134.    Purchases of SanDisk Post-Release MP3 Players from ATG are ordered and fulfilled through the mail and, in most cases, across state lines. Purchases of audio files comprising the Purchased Music Collections are made over TRULINCS (which operates throughout BOP's nation-wide system of institutions) and, therefore, are also concluded across state lines.

135.   Pursuant to 15 U.S.C. § 15, in addition to actual damages, Plaintiffs and all other members of the Released Purchaser National Class are entitled to recover from ATG and SanDisk treble damages and attorney's fees for the above-described *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## COUNT IV
### Conspiracy to Violate Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1:
### Unlawful Tying: Rule of Reason (Prison-Restricted MP3 Players)
### (On Behalf of the Released Purchaser National Class)

136.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

137.   Alternatively, the above-described actions of ATG and SanDisk associated with the tying of SanDisk Prison-Restricted MP3 Players to the purchase of SanDisk Post-Release MP3 Players constitute a conspiracy to effect a tying arrangement in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 under a Rule of Reason analysis, which has directly and proximately caused economic injury to Plaintiffs in an amount to be proven at trial.

138.   ATG and SanDisk agreed and conspired to violate Section 1 of the Sherman Act, 15 U.S.C. § 1, through this unlawful tying arrangement, as evidenced by, among other things (i) the continuing agreement, beginning in or about 2012, between ATG and SanDisk that only SanDisk's Sansa Clip+ would be available for sale as a Prison-Restricted MP3 Player, (ii) the continuing agreement, beginning in or about 2012, between ATG and SanDisk to place physical and technological locks and restrictions on all Prison-Restricted MP3 Players with the specific knowledge and intent that those Prison-Restricted MP3 Players would be sold by ATG to inmates in BOP Facilities, (iii) ATG's and SanDisk's joint disclaimer and modification, in the Post-Release Terms, of

34

the one-year product warranty that comes with SanDisk Prison Restricted MP3 Players, (iv) the continuing agreement, beginning in or about 2012, between ATG and SanDisk that SanDisk would be the exclusive supplier of Post-Release MP3 Players to ATG with the specific knowledge and/or intent that they be sold to Released Purchasers as a requirement for those Released Purchasers being able to retain their Purchased Music Collection, and (v) SanDisk's inclusion on its website of information about, and links to, the Post-Release Terms and other documents and information concerning the so-called "deinstitutionalization" process.

139.   The tying product is the SanDisk Prison-Restricted MP3 Player, which ATG has the exclusive right to sell to inmates in BOP Facilities throughout the United States as a result of its Exclusivity Agreement with the BOP.

140.   The Exclusivity Agreement constitutes a complete barrier to entry for potential competitors for the sale of Prison-Restricted MP3 Players, giving ATG appreciable economic power in the market for sale of Prison-Restricted MP3 Players to inmates in BOP Facilities.  ATG imposes on such purchasers an undisclosed (and, thus, unforeseeable) restriction upon their access to a necessary by-product of their purchases after release from prison – their Purchased Music Collection.

141.   The tied product is the SanDisk Post-Release MP3 Player, which ATG markets to Released Purchasers and which ATG requires Released Purchasers to buy in order to retain ownership and possession of the MP3 music and other audio files that the Released Purchasers bought prior to release from prison and that make up their Purchased Music Collections, consisting of up to 1,500 songs, or up to approximately $2,700.00 worth of MP3 files.

142. Prison-Restricted MP3 Players, which are subject to the physical and technological restrictions and modifications described above, are separate and distinct products from Post-Release MP3 Players, which are not subject to any physical and/or technological restrictions.

143. Because ATG only sells physically and technologically locked SanDisk MP3 players to inmates in BOP Facilities, SanDisk's supply of MP3 players to ATG enables ATG's appreciable economic power in the market for the sale of Prison-Restricted MP3 Players, which also enables ATG to tie the purchase of SanDisk Post-Release MP3 Players. Through this arrangement, SanDisk functionally also has appreciable market power in the market for sale of Prison-Restricted MP3 Players and improperly benefits from the tying of those products to the purchase of SanDisk Post-Release MP3 Players.

144. ATG's unilaterally imposed requirement that Released Purchasers purchase SanDisk Post-Release MP3 Players from ATG is an unlawful exploitation of ATG's control over the tying product to restrain trade in the market for the tied product by forcing the Released Purchasers into the purchase of a tied product (a SanDisk Post-Release MP3 Player) from ATG, regardless of the fact that the Released Purchaser might have preferred to purchase a Post-Release MP3 Player elsewhere on different terms, as evidenced by, among other things, the fact that purchasers of the tying product who are subsequently released from prison (Released Purchasers) are thereafter permanently deprived of their up to $2,700 worth of MP3 audio files (*i.e.*, their Purchased Music Collection) unless they first purchase the tied product from ATG within one year of their release.

145.     In other words, ATG and SanDisk's imposition of a technological lock, making purchase of the tied product from ATG (as opposed to any of ATG's many competitors in the tied product market) a prerequisite to a Released Purchaser's ability to retain ownership and possession of his or her Purchased Music Collection, means that a Released Purchaser's only economically viable option is to purchase both the tying and the tied product.

146.     SanDisk's exclusive supply of Post-Release MP3 Players to ATG enables ATG's tying and restraint of trade in the market for Post-Release MP3 Players.  SanDisk improperly benefits from its contribution to the above-described tying arrangement through ATG's exclusive, market-restrained sales of SanDisk Post-Release MP3 Players.

147.     ATG's actions associated with the tying of SanDisk Prison-Restricted MP3 Players to the purchase of SanDisk Post-Release MP3 Players have affected a not insubstantial amount of interstate commerce in the market for the tied products.  Among other things, based on ATG's sales of SanDisk Prison-Restricted MP3 Players to approximately forty percent (40%) of inmates in BOP Facilities, approximately 20,000 inmates released each year from BOP Facilities purchased a SanDisk Prison-Restricted MP3 Player from ATG prior to release from prison.  Each of those Released Purchasers, upon his or her release, is faced with the "Hobson's Choice" of purchasing a SanDisk Post-Release MP3 Player from ATG or forfeiting up to $2,700 worth of audio content in his or her Purchased Music Collection (representing many millions of dollars).

148.     In light of the substantial investment that purchasers of SanDisk Prison-Restricted MP3 Players make in their Purchased Music Collections, ATG's imposition of an unforeseeable restriction of the ability to access the Purchased Music Collection after

release from prison has put all rational buyers in the market for Post-Release MP3 Players in the position of having only one economically viable option – the purchase from ATG of both the tying product (a SanDisk Prison-Restricted MP3 Player) and the tied product (a SanDisk Post-Release MP3 Player). The result is that all of ATG's competitors in the market for Post-Release MP3 Players are excluded from sales to Released Purchasers, constituting an unreasonable restraint on competition in the market for Post-Release MP3 Players.

149.    Each and every member of the Released Purchaser National Class has been damaged by ATG and SanDisk's anticompetitive and unlawful tying arrangement.

150.    Purchases of SanDisk Post-Release MP3 Players from ATG are ordered and fulfilled through the mail and, in most cases, across state lines. Purchases of audio files comprising the Purchased Music Collections are made over TRULINCS (which operates throughout BOP's nation-wide system of institutions) and, therefore, are also concluded across state lines.

151.    Pursuant to 15 U.S.C. § 15, in addition to actual damages, Plaintiffs and all other members of the Released Purchaser National Class are entitled to recover from ATG and SanDisk treble damages and attorney's fees for the above-described violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### COUNT V
### Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1:
### Unlawful Tying: *Per Se* (Purchased Music Collection)
### (On Behalf of the Released Purchaser National Class)

152.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

153.    ATG's conduct in requiring Released Purchasers to purchase SanDisk Post-Release MP3 Players from ATG as a condition to the ability to keep or use any of the Released Purchaser's Purchased Music Collection after his or her release from prison constitutes a tying arrangement in per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, which has directly and proximately caused economic injury to Plaintiffs in an amount to be proven at trial.

154.    The tying products are the MP3 music and other audio files making up the Purchased Music Collection, which ATG has the exclusive right to sell to inmates in BOP Facilities throughout the United States as a result of its Exclusivity Agreement with the BOP.

155.    The Exclusivity Agreement constitutes a complete barrier to entry for potential competitors for the sale of MP3 music and other audio files to inmates in BOP Facilities, giving ATG appreciable economic power in the market for sale of the tying products to inmates in BOP Facilities.

156.    The tied product is the SanDisk Post-Release MP3 Player, which ATG markets to Released Purchasers and which ATG requires Released Purchasers to buy in order to retain ownership and possession of the MP3 music and other audio files that the Released Purchasers bought prior to release from prison and that make up their Purchased Music Collections, consisting of up to 1,500 songs, or up to approximately $2,700.00 worth of MP3 files.

157.    MP3 music and other audio files are separate and distinct products from Post-Release MP3 Players.

158.    ATG's unilaterally imposed requirement that Released Purchasers purchase SanDisk Post-Release MP3 Players from ATG is an unlawful exploitation of ATG's control over the tying product to restrain trade in the market for the tied product by forcing the Released Purchasers into the purchase of a tied product (a SanDisk Post-Release MP3 Player) from ATG, regardless of the fact that the Released Purchaser might have preferred to purchase a Post-Release MP3 Player elsewhere on different terms,, as evidenced by, among other things, the fact that purchasers of the tying products who are subsequently released from prison (Released Purchasers) are thereafter permanently deprived of their up to $2,700 worth of MP3 audio files (i.e., their Purchased Music Collection) unless they first purchase the tied product from ATG within one year of their release.

159.    In other words, ATG and SanDisk's imposition of a technological lock, making purchase of the tied product from ATG (as opposed to any of ATG's many competitors in the tied product market) a prerequisite to a Released Purchaser's ability to retain ownership and possession of his or her Purchased Music Collection, means that a Released Purchaser's only economically viable option is to purchase both the tying and the tied product.

160.    ATG's actions associated with the tying of the MP3 music and other audio files making up the Purchased Music Collection to the purchase of SanDisk Post-Release MP3 Players have affected a not insubstantial amount of interstate commerce in the market for the tied products. Among other things, based on ATG's sales of Prison-Restricted MP3 Players to approximately forty percent (40%) of inmates in BOP Facilities, approximately 20,000 inmates released each year from BOP Facilities

purchased a the MP3 music and other audio files making up the Purchased Music Collection from ATG prior to release from prison. Each of those Released Purchasers, upon his or her release, is faced with the "Hobson's Choice" of purchasing a SanDisk Post-Release MP3 Player from ATG or forfeiting up to $2,700 worth of audio content in his or her Purchased Music Collection (representing many millions of dollars).

161.    Each and every member of the Released Purchaser National Class has been damaged by ATG's anticompetitive and unlawful tying arrangement.

162.    Purchases of SanDisk Post-Release MP3 Players from ATG are ordered and fulfilled through the mail and, in most cases, across state lines. Purchases of audio files comprising the Purchased Music Collections are made over TRULINCS (which operates throughout BOP's nation-wide system of institutions) and, therefore, are also concluded across state lines.

163.    Pursuant to 15 U.S.C. § 15, in addition to actual damages, Plaintiffs and all other members of the Released Purchaser National Class are entitled to recover from ATG treble damages and attorney's fees for the above-described *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### COUNT VI
### Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1:
### Unlawful Tying: Rule of Reason (Purchased Music Collection)
### (On Behalf of the Released Purchaser National Class)

164.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

165.    Alternatively, the above-described actions of ATG associated with the tying of MP3 music and other audio files making up the Purchased Music Collection to the purchase of SanDisk Post-Release MP3 Players constitute a tying arrangement in

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 under a Rule of Reason analysis, which has directly and proximately caused economic injury to Plaintiffs in an amount to be proven at trial.

166.    The tying products are the MP3 music and other audio files making up the Purchased Music Collection, which ATG has the exclusive right to sell to federal inmates in BOP Facilities throughout the United States as a result of its Exclusivity Agreement with the BOP.

167.    The Exclusivity Agreement constitutes a complete barrier to entry for potential competitors for the sale of MP3 music and other audio files to inmates in BOP Facilities, giving ATG appreciable economic power in the market for the tying products to inmates in BOP Facilities.

168.    The tied product is the SanDisk Post-Release MP3 Player, which ATG markets to Released Purchasers and which ATG requires Released Purchasers to buy in order to retain ownership and possession of the MP3 music and other audio files that the Released Purchasers bought prior to release from prison and that make up their Purchased Music Collections, consisting of up to 1,500 songs, or up to approximately $2,700.00 worth of MP3 files.

169.    MP3 music and other audio files are separate and distinct products from Post-Release MP3 Players.

170.    ATG's unilaterally imposed requirement that Released Purchasers purchase SanDisk Post-Release MP3 Players from ATG is an unlawful exploitation of ATG's control over the tying product to restrain trade in the market for the tied product by forcing the Released Purchasers into the purchase of a tied product (a SanDisk Post-

Release MP3 Player) from ATG, regardless of the fact that the Released Purchaser might have preferred to purchase a Post-Release MP3 Player elsewhere on different terms, as evidenced by, among other things, the fact that purchasers of the tying products who are subsequently released from prison (Released Purchasers) are thereafter permanently deprived of their up to $2,700 worth of MP3 audio files (i.e., their Purchased Music Collection) unless they first purchase the tied product from ATG within one year of their release.

171.    In other words, ATG and SanDisk's imposition of a technological lock, making purchase of the tied product from ATG (as opposed to any of ATG's many competitors in the tied product market) a prerequisite to a Released Purchaser's ability to retain ownership and possession of his or her Purchased Music Collection, means that a Released Purchaser's only economically viable option is to purchase both the tying and the tied product.

172.    ATG's actions associated with the tying of MP3 music and other audio files to the purchase of SanDisk Post-Release MP3 Players have affected a not insubstantial amount of interstate commerce in the market for the tied products.  Among other things, based on ATG's sales of Prison-Restricted MP3 Players to approximately forty percent (40%) of inmates in BOP Facilities, approximately 20,000 inmates released each year from BOP Facilities purchased MP3 music and other audio files making up the Purchased Music Collection from ATG prior to release from prison. Each of those Released Purchasers, upon his or her release, is faced with the "Hobson's Choice" of purchasing a SanDisk Post-Release MP3 Player from ATG or forfeiting up to $2,700

worth of audio content in his or her Purchased Music Collection (representing many millions of dollars).

173.    In light of the substantial investment that purchasers of MP3 music and other audio files make in their Purchased Music Collections, ATG's imposition of an unforeseeable restriction of the ability to access the Purchased Music Collection after release from prison has put all rational buyers in the market for Post-Release MP3 Players in the position of having only one economically viable option – the purchase from ATG of both the tying products (MP3 music and other audio files) and the tied product (a SanDisk Post-Release MP3 Player). The result is that all of ATG's competitors in the market for Post-Release MP3 Players are excluded from sales to Released Purchasers, constituting an unreasonable restraint on competition in the market for Post-Release MP3 Players.

174.    Each and every member of the Released Purchaser National Class has been damaged by ATG's anticompetitive and unlawful tying arrangement.

175.    Purchases of SanDisk Post-Release MP3 Players from ATG are ordered and fulfilled through the mail and, in most cases, across state lines. Purchases of audio files comprising the Purchased Music Collections are made over TRULINCS (which operates throughout BOP's nation-wide system of institutions) and, therefore, are also concluded across state lines.

176.    Pursuant to 15 U.S.C. § 15, in addition to actual damages, Plaintiffs and all other members of the Released Purchaser National Class are entitled to recover from ATG treble damages and attorney's fees for the above-described violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## COUNT VII
### Conspiracy to Violate Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1: Unlawful Tying: *Per Se* (Purchased Music Collection) (On Behalf of the Released Purchaser National Class)

177.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

178.   ATG and SanDisk's conduct in requiring Released Purchasers to purchase SanDisk Post-Release MP3 Players from ATG as a condition to the ability to keep or use any of the Released Purchaser's Purchased Music Collection after his or her release from prison constitutes a conspiracy to effect a tying arrangement in per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, which has directly and proximately caused economic injury to Plaintiffs in an amount to be proven at trial.

179.   ATG and SanDisk agreed and conspired to violate Section 1 of the Sherman Act, 15 U.S.C. § 1, through this unlawful tying arrangement, as evidenced by, among other things (i) the continuing agreement, beginning in or about 2012, between ATG and SanDisk that only SanDisk's Sansa Clip+ would be available for sale as a Prison-Restricted MP3 Player, (ii) the continuing agreement, beginning in or about 2012, between ATG and SanDisk to place physical and technological locks and restrictions on all Prison-Restricted MP3 Players with the specific knowledge and intent that those Prison-Restricted MP3 Players would be sold by ATG to inmates in BOP Facilities, (iii) ATG's and SanDisk's joint disclaimer and modification, in the Post-Release Terms, of the one-year product warranty that comes with SanDisk Prison Restricted MP3 Players, (iv) the continuing agreement, beginning in or about 2012, between ATG and SanDisk that SanDisk would be the exclusive supplier of Post-Release MP3 Players to ATG with the specific knowledge and/or intent that they be sold to Released Purchasers as a

requirement for those Released Purchasers being able to retain their Purchased Music Collection, and (v) SanDisk's inclusion on its website of information about, and links to, the Post-Release Terms and other documents and information concerning the so-called "deinstitutionalization" process.

180.    The tying products are the MP3 music and other audio files making up the Purchased Music Collection, which ATG has the exclusive right to sell to inmates in BOP Facilities throughout the United States as a result of its Exclusivity Agreement with the BOP.

181.    The Exclusivity Agreement constitutes a complete barrier to entry for potential competitors for the sale of MP3 music and other audio files to inmates in BOP Facilities, giving ATG appreciable economic power in the market for sale of the tying products to inmates in BOP Facilities.

182.    The tied product is the SanDisk Post-Release MP3 Player, which ATG markets to Released Purchasers and which ATG requires Released Purchasers to buy in order to retain ownership and possession of the MP3 music and other audio files that the Released Purchasers bought prior to release from prison and that make up their Purchased Music Collections, consisting of up to 1,500 songs, or up to approximately $2,700.00 worth of MP3 files.

183.    MP3 music and other audio files are separate and distinct products from Post-Release MP3 Players.

184.    Because ATG only sells physically and technologically locked SanDisk MP3 players to inmates in BOP Facilities in order for them to listen to their Purchased Music Collections, SanDisk's supply of those MP3 players to ATG enables ATG's

46

appreciable economic power in the market for the sale of MP3 music and other audio files to inmates in BOP Facilities, which also enables ATG to tie the purchase of SanDisk Post-Release MP3 Players.

185.    ATG's unilaterally imposed requirement that Released Purchasers purchase SanDisk Post-Release MP3 Players from ATG is an unlawful exploitation of ATG's control over the tying product to restrain trade in the market for the tied product by forcing the Released Purchasers into the purchase of a tied product (a SanDisk Post-Release MP3 Player) from ATG, regardless of the fact that the Released Purchaser might have preferred to purchase a Post-Release MP3 Player elsewhere on different terms, as evidenced by, among other things, the fact that purchasers of the tying products who are subsequently released from prison (Released Purchasers) are thereafter permanently deprived of their up to $2,700 worth of MP3 audio files (i.e., their Purchased Music Collection) unless they first purchase the tied product from ATG within one year of their release.

186.    In other words, ATG and SanDisk's imposition of a technological lock, making purchase of the tied product from ATG (as opposed to any of ATG's many competitors in the tied product market) a prerequisite to a Released Purchaser's ability to retain ownership and possession of his or her Purchased Music Collection, means that a Released Purchaser's only economically viable option is to purchase both the tying and the tied product.

187.    SanDisk's exclusive supply of Post-Release MP3 Players to ATG enables ATG's tying and restraint of trade in the market for Post-Release MP3 Players.  SanDisk

improperly benefits from its contribution to the above-described tying arrangement through ATG's exclusive, market-restrained sales of SanDisk Post-Release MP3 Players.

188. ATG's actions associated with the tying of the MP3 music and other audio files making up the Purchased Music Collection to the purchase of SanDisk Post-Release MP3 Players have affected a not insubstantial amount of interstate commerce in the market for the tied products. Among other things, based on ATG's sales of Prison-Restricted MP3 Players to approximately forty percent (40%) of inmates in BOP Facilities, approximately 20,000 inmates released each year from BOP Facilities purchased a the MP3 music and other audio files making up the Purchased Music Collection from ATG prior to release from prison. Each of those Released Purchasers, upon his or her release, is faced with the "Hobson's Choice" of purchasing a SanDisk Post-Release MP3 Player from ATG or forfeiting up to $2,700 worth of audio content in his or her Purchased Music Collection (representing many millions of dollars).

189. Each and every member of the Released Purchaser National Class has been damaged by ATG and SanDisk's anticompetitive and unlawful tying arrangement.

190. Purchases of SanDisk Post-Release MP3 Players from ATG are ordered and fulfilled through the mail and, in most cases, across state lines. Purchases of audio files comprising the Purchased Music Collections are made over TRULINCS (which operates throughout BOP's nation-wide system of institutions) and, therefore, are also concluded across state lines.

191. Pursuant to 15 U.S.C. § 15, in addition to actual damages, Plaintiffs and all other members of the Released Purchaser National Class are entitled to recover from

ATG and SanDisk treble damages and attorney's fees for the above-described *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## COUNT VIII
### Conspiracy to Violate Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1:
### Unlawful Tying: Rule of Reason (Purchased Music Collection)
### (On Behalf of the Released Purchaser National Class)

192.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

193.    Alternatively, the above-described actions of ATG and SanDisk associated with the tying of MP3 music and other audio files making up the Purchased Music Collection to the purchase of SanDisk Post-Release MP3 Players constitute a conspiracy to effect tying arrangement in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 under a Rule of Reason analysis, which has directly and proximately caused economic injury to Plaintiffs in an amount to be proven at trial.

194.    ATG and SanDisk agreed and conspired to violate Section 1 of the Sherman Act, 15 U.S.C. § 1, through this unlawful tying arrangement, as evidenced by, among other things (i) the continuing agreement, beginning in or about 2012, between ATG and SanDisk that only SanDisk's Sansa Clip+ would be available for sale as a Prison-Restricted MP3 Player, (ii) the continuing agreement, beginning in or about 2012, between ATG and SanDisk to place physical and technological locks and restrictions on all Prison-Restricted MP3 Players with the specific knowledge and intent that those Prison-Restricted MP3 Players would be sold by ATG to inmates in BOP Facilities, (iii) ATG's and SanDisk's joint disclaimer and modification, in the Post-Release Terms, of the one-year product warranty that comes with SanDisk Prison Restricted MP3 Players, (iv) the continuing agreement, beginning in or about 2012, between ATG and SanDisk

that SanDisk would be the exclusive supplier of Post-Release MP3 Players to ATG with the specific knowledge and/or intent that they be sold to Released Purchasers as a requirement for those Released Purchasers being able to retain their Purchased Music Collection, and (v) SanDisk's inclusion on its website of information about, and links to, the Post-Release Terms and other documents and information concerning the so-called "deinstitutionalization" process.

195.    The tying products are the MP3 music and other audio files making up the Purchased Music Collection, which ATG has the exclusive right to sell to federal inmates in BOP Facilities throughout the United States as a result of its Exclusivity Agreement with the BOP.

196.    The Exclusivity Agreement constitutes a complete barrier to entry for potential competitors for the sale of MP3 music and other audio files to inmates in BOP Facilities, giving ATG appreciable economic power in the market for the tying products to inmates in BOP Facilities.

197.    The tied product is the SanDisk Post-Release MP3 Player, which ATG markets to Released Purchasers and which ATG requires Released Purchasers to buy in order to retain ownership and possession of the MP3 music and other audio files that the Released Purchasers bought prior to release from prison and that make up their Purchased Music Collections, consisting of up to 1,500 songs, or up to approximately $2,700.00 worth of MP3 files.

198.    MP3 music and other audio files are separate and distinct products from Post-Release MP3 Players.

199.   Because ATG only sells physically and technologically locked SanDisk MP3 players to inmates in BOP Facilities in order for them to listen to their Purchased Music Collections, SanDisk's supply of those MP3 players to ATG enables ATG's appreciable economic power in the market for the sale of MP3 music and other audio files to inmates in BOP Facilities, which also enables ATG to tie the purchase of SanDisk Post-Release MP3 Players.

200.   ATG's unilaterally imposed requirement that Released Purchasers purchase SanDisk Post-Release MP3 Players from ATG is an unlawful exploitation of ATG's control over the tying product to restrain trade in the market for the tied product by forcing the Released Purchasers into the purchase of a tied product (a SanDisk Post-Release MP3 Player) from ATG, regardless of the fact that the Released Purchaser might have preferred to purchase a Post-Release MP3 Player elsewhere on different terms, as evidenced by, among other things, the fact that purchasers of the tying products who are subsequently released from prison (Released Purchasers) are thereafter permanently deprived of their up to $2,700 worth of MP3 audio files (i.e., their Purchased Music Collection) unless they first purchase the tied product from ATG within one year of their release.

201.   In other words, ATG and SanDisk's imposition of a technological lock, making purchase of the tied product from ATG (as opposed to any of ATG's many competitors in the tied product market) a prerequisite to a Released Purchaser's ability to retain ownership and possession of his or her Purchased Music Collection, means that a Released Purchaser's only economically viable option is to purchase both the tying and the tied product.

202.    SanDisk's exclusive supply of Post-Release MP3 Players to ATG enables ATG's tying and restraint of trade in the market for Post-Release MP3 Players.  SanDisk improperly benefits from its contribution to the above-described tying arrangement through ATG's exclusive, market-restrained sales of SanDisk Post-Release MP3 Players.

203.    ATG's actions associated with the tying of MP3 music and other audio files to the purchase of SanDisk Post-Release MP3 Players have affected a not insubstantial amount of interstate commerce in the market for the tied products.  Among other things, based on ATG's sales of Prison-Restricted MP3 Players to approximately forty percent (40%) of inmates in BOP Facilities, approximately 20,000 inmates released each year from BOP Facilities purchased MP3 music and other audio files making up the Purchased Music Collection from ATG prior to release from prison. Each of those Released Purchasers, upon his or her release, is faced with the "Hobson's Choice" of purchasing a SanDisk Post-Release MP3 Player from ATG or forfeiting up to $2,700 worth of audio content in his or her Purchased Music Collection (representing many millions of dollars).

204.    In light of the substantial investment that purchasers of MP3 music and other audio files make in their Purchased Music Collections, ATG's imposition of an unforeseeable restriction of the ability to access the Purchased Music Collection after release from prison has put all rational buyers in the market for Post-Release MP3 Players in the position of having only one economically viable option – the purchase from ATG of both the tying products (MP3 music and other audio files) and the tied product (a SanDisk Post-Release MP3 Player). The result is that all of ATG's competitors in the market for Post-Release MP3 Players are excluded from sales to Released

Purchasers, constituting an unreasonable restraint on competition in the market for Post-Release MP3 Players.

205.   Each and every member of the Released Purchaser National Class has been damaged by ATG and SanDisk's anticompetitive and unlawful tying arrangement.

206.   Purchases of SanDisk Post-Release MP3 Players from ATG are ordered and fulfilled through the mail and, in most cases, across state lines. Purchases of audio files comprising the Purchased Music Collections are made over TRULINCS (which operates throughout BOP's nation-wide system of institutions) and, therefore, are also concluded across state lines.

207.   Pursuant to 15 U.S.C. § 15, in addition to actual damages, Plaintiffs and all other members of the Released Purchaser National Class are entitled to recover from ATG and SanDisk treble damages and attorney's fees for the above-described violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## COUNT IX
### Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2:
### Unlawful Monopolization
### (On Behalf of the Released Purchaser National Class)

208.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

209.   Pursuant to its Exclusivity Agreement, which constitutes a complete barrier to entry for potential competitors for the sale of Prison-Restricted MP3 Players and MP3 music and audio files, ATG is the only seller of Prison-Restricted MP3 Players and MP3 music and audio files to inmates in BOP Facilities.

210.   ATG utilizes its Exclusivity Agreement to impose upon all purchasers of (1) its SanDisk Prison-Restricted MP3 Players and (2) its MP3 music and audio files

making up the Purchased Music Collection an unforeseeable restriction of Released Purchasers' ability to retain ownership and possession of their Purchased Music Collection after release from prison unless they purchase a SanDisk Post-Release MP3 Players from ATG. These acts have had exclusionary and anti-competitive effects with respect to the market for sales of Post-Release MP3 Players, constituting ATG's willful acquisition and maintenance of monopoly power in the market for Post-Release MP3 Players.

211. ATG's utilization of its Exclusivity Agreement to deprive Released Purchasers of their Purchased Music Collections unless they purchase a SanDisk Post-Release MP3 Player from ATG imposes prohibitive switching costs upon any Released Purchaser who desires to purchase a Post-Release MP3 Player from any source other than ATG, thereby harming competition generally in the market for Post-Release MP3 Players and enabling ATG to maintain a monopoly in the market.

212. ATG's willful and unlawful exercise of its monopoly power over the market for Post-Release MP3 Players has excluded all suppliers of MP3 players, other than ATG, from sales of Post-Release MP3 players to Released Purchasers.

213. Plaintiffs and the Released Purchaser National Class have been injured in fact by ATG's unlawful monopolization because they have been deprived of the choice of purchasing lower cost and/or better quality alternatives to ATG's SanDisk Post-Release MP3 Players.

214. ATG's conduct associated with the sale of Post-Release MP3 Players constitutes unlawful monopolization in violation of Section 2 of the Sherman Act, 15

U.S.C. § 2, which has directly and proximately caused economic injury to Plaintiffs and the Released Purchaser National Class in an amount to be proven at trial.

215.    Pursuant to 15 U.S.C. § 15, Plaintiffs and all other members of the Released Purchaser National Class are entitled to recover from ATG treble damages and attorney's fees for the above-described violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## COUNT X
### Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2:
### Unlawful Attempted Monopolization
### (On Behalf of the Released Purchaser National Class)

216.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

217.    Alternatively, ATG has engaged in exclusionary, predatory, and anticompetitive conduct with a specific intent to monopolize the market for Post-Release MP3 Players.

218.    Specifically, ATG has attempted unlawfully to acquire monopoly power in the market for Post-Release MP3 Players by imposing upon all purchasers of (1) its SanDisk Prison-Restricted MP3 Players and (2) its MP3 music and audio files making up the Purchased Music Collection, through utilization of its Exclusivity Agreement, an unforeseeable restriction of Released Purchasers' ability to retain ownership and possession of their Purchased Music Collections after release from prison unless they purchase SanDisk Post-Release MP3 Players from ATG.  These acts have had exclusionary and anti-competitive effects with respect to the market for sales of Post-Release MP3 Players, on which ATG is capitalizing in an attempt to monopolize the market for Post-Release MP3 Players.

219.   ATG is attempting to monopolize the market for Post-Release MP3 Players through its anticompetitive, willful, and unlawful actions, utilizing its Exclusivity Agreement to deprive Released Purchasers of their Purchased Music Collections unless they purchase a SanDisk Post-Release MP3 Player from ATG. This imposes prohibitive switching costs upon any Released Purchaser who desires to purchase a Post-Release MP3 Player from any source other than ATG, thereby harming competition generally in the market for Post-Release MP3 Players by excluding all suppliers of MP3 players, other than ATG, from sales of Post-Release MP3 players to Released Purchasers.

220.   ATG does not have a legitimate business justification for its exclusionary, predatory, and anticompetitive conduct.

221.   ATG's anticompetitive actions have created a dangerous probability that ATG will achieve monopoly power in the market for Post-Release MP3 Players because ATG has already unlawfully achieved an economically significant degree of market power in that market and has effectively foreclosed new and potential entrants from entering the market or gaining their naturally competitive market shares.

222.   ATG's anticompetitive actions have created substantial barriers to entry by competitors into the market for Post-Release MP3 Players – namely, the prohibitive switching costs imposed upon Released Purchasers desiring to purchase a Post-Release MP3 Player from any source other than ATG.

223.   Plaintiffs and the Released Purchaser National Class have been injured in fact by ATG's unlawful attempted monopolization because they have been deprived of the choice of purchasing lower cost and/or better quality alternatives to ATG's SanDisk Post-Release MP3 Players.

224.    ATG's conduct associated with the sale of Post-Release MP3 Players constitutes unlawful attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, which has directly and proximately caused economic injury to Plaintiffs and the Released Purchaser National Class in an amount to be proven at trial.

225.    Pursuant to 15 U.S.C. § 15, Plaintiffs and all other members of the Released Purchaser National Class are entitled to recover from ATG treble damages and attorney's fees for the above-described violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## COUNT XI
**Conspiracy to Violate Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2:
Unlawful Monopolization
(On Behalf of the Released Purchaser National Class)**

226.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

227.    ATG and SanDisk agreed and conspired to violate Section 2 of the Sherman Act, 15 U.S.C. § 2, through unlawful monopolization, as evidenced by, among other things (i) the continuing agreement, beginning in or about 2012, between ATG and SanDisk that only SanDisk's Sansa Clip+ would be available for sale as a Prison-Restricted MP3 Player, (ii) the continuing agreement, beginning in or about 2012, between ATG and SanDisk to place physical and technological locks and restrictions on all Prison-Restricted MP3 Players with the specific knowledge and intent that those Prison-Restricted MP3 Players would be sold by ATG to inmates in BOP Facilities, (iii) ATG's and SanDisk's joint disclaimer and modification, in the Post-Release Terms, of the one-year product warranty that comes with SanDisk Prison Restricted MP3 Players, (iv) the continuing agreement, beginning in or about 2012, between ATG and SanDisk

that SanDisk would be the exclusive supplier of Post-Release MP3 Players to ATG with the specific knowledge and/or intent that they be sold to Released Purchasers as a requirement for those Released Purchasers being able to retain their Purchased Music Collection, and (v) SanDisk's inclusion on its website of information about, and links to, the Post-Release Terms and other documents and information concerning the so-called "deinstitutionalization" process.

228.   Pursuant to its Exclusivity Agreement, which constitutes a complete barrier to entry for potential competitors for the sale of Prison-Restricted MP3 Players and MP3 music and audio files, ATG is the only seller of MP3 music and audio files to inmates in BOP Facilities and in conjunction with SanDisk is the only seller of Prison-Restricted MP3 Players to inmates in BOP Facilities.

229.   ATG and SanDisk utilize ATG's  Exclusivity Agreement to impose upon all purchasers of (1) its SanDisk Prison-Restricted MP3 Players and (2) its MP3 music and audio files making up the Purchased Music Collection an unforeseeable restriction of Released Purchasers' ability to retain ownership and possession of their Purchased Music Collection after release from prison unless they purchase a SanDisk Post-Release MP3 Players from ATG.  These acts have had exclusionary and anti-competitive effects with respect to the market for sales of Post-Release MP3 Players, constituting ATG's willful acquisition and maintenance, with the aid and support of SanDisk, of monopoly power in the market for Post-Release MP3 Players.

230.   ATG's and SanDisk's utilization of ATG's Exclusivity Agreement to deprive Released Purchasers of their Purchased Music Collections unless they purchase a SanDisk Post-Release MP3 Player from ATG imposes prohibitive switching costs upon

any Released Purchaser who desires to purchase a Post-Release MP3 Player from any source other than ATG, thereby harming competition generally in the market for Post-Release MP3 Players and enabling ATG to maintain a monopoly in the market.

231. Because ATG only sells physically and technologically locked SanDisk MP3 players to inmates in BOP Facilities and also only sells SanDisk MP3 players to Released Purchasers, SanDisk's supply of MP3 players to ATG enables ATG's scheme and monopolization of the market for Post-Release MP3 Players.

232. ATG's willful and unlawful exercise of its monopoly power over the market for Post-Release MP3 Players has excluded all suppliers of MP3 players, other than ATG, from sales of Post-Release MP3 players to Released Purchasers.

233. SanDisk's exclusive supply of Post-Release MP3 Players to ATG enables ATG's monopoly in the market for Post-Release MP3 Players. SanDisk improperly benefits from its contribution to ATG's monopoly through ATG's exclusive, market-restrained sales of SanDisk Post-Release MP3 Players.

234. Plaintiffs and the Released Purchaser National Class have been injured in fact by ATG's unlawful monopolization because they have been deprived of the choice of purchasing lower cost and/or better quality alternatives to ATG's SanDisk Post-Release MP3 Players.

235. ATG and SanDisk's conduct associated with the sale of Post-Release MP3 Players constitutes unlawful monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, which has directly and proximately caused economic injury to Plaintiffs and the Released Purchaser National Class in an amount to be proven at trial.

236.   Pursuant to 15 U.S.C. § 15, Plaintiffs and all other members of the Released Purchaser National Class are entitled to recover from ATG and SanDisk treble damages and attorney's fees for the above-described violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

### COUNT XII
### Conspiracy to Violate Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2:
### Unlawful Attempted Monopolization
### (On Behalf of the Released Purchaser National Class)

237.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

238.   Alternatively, ATG and SanDisk have engaged in exclusionary, predatory, and anticompetitive conduct with a specific intent to monopolize the market for Post-Release MP3 Players.

239.   ATG and SanDisk agreed and conspired to violate Section 2 of the Sherman Act, 15 U.S.C. § 2, through unlawful attempted monopolization, as evidenced by, among other things (i) the continuing agreement, beginning in or about 2012, between ATG and SanDisk that only SanDisk's Sansa Clip+ would be available for sale as a Prison-Restricted MP3 Player, (ii) the continuing agreement, beginning in or about 2012, between ATG and SanDisk to place physical and technological locks and restrictions on all Prison-Restricted MP3 Players with the specific knowledge and intent that those Prison-Restricted MP3 Players would be sold by ATG to inmates in BOP Facilities, (iii) ATG's and SanDisk's joint disclaimer and modification, in the Post-Release Terms, of the one-year product warranty that comes with SanDisk Prison Restricted MP3 Players, (iv) the continuing agreement, beginning in or about 2012, between ATG and SanDisk that SanDisk would be the exclusive supplier of Post-Release MP3 Players to ATG with

the specific knowledge and/or intent that they be sold to Released Purchasers as a requirement for those Released Purchasers being able to retain their Purchased Music Collection, and (v) SanDisk's inclusion on its website of information about, and links to, the Post-Release Terms and other documents and information concerning the so-called "deinstitutionalization" process.

240.   Specifically, ATG and SanDisk have attempted unlawfully to establish ATG's monopoly power in the market for Post-Release MP3 Players by imposing upon all purchasers of (1) SanDisk Prison-Restricted MP3 Players and (2) MP3 music and audio files making up the Purchased Music Collection, through utilization of ATG's Exclusivity Agreement, an unforeseeable restriction of Released Purchasers' ability to retain ownership and possession of their Purchased Music Collections after release from prison unless they purchase SanDisk Post-Release MP3 Players from ATG.  These acts have had exclusionary and anti-competitive effects with respect to the market for sales of Post-Release MP3 Players, on which ATG and SanDisk are capitalizing in an attempt to have ATG monopolize the market for Post-Release MP3 Players.

241.   By depriving Released Purchasers of their Purchased Music Collections unless they purchase a SanDisk Post-Release MP3 Player from ATG, ATG and SanDisk impose prohibitive switching costs upon any Released Purchaser who desires to purchase a Post-Release MP3 Player from any source other than ATG, thereby harming competition generally in the market for Post-Release MP3 Players by excluding all suppliers of MP3 players, other than ATG, from sales of Post-Release MP3 players to Released Purchasers.

242.   Because ATG only sells physically and technologically locked SanDisk MP3 players to inmates in BOP Facilities and also only sells SanDisk MP3 players to Released Purchasers, SanDisk's supply of MP3 players to ATG enables ATG's scheme and attempted monopolization of the market for Post-Release MP3 Players.

243.   ATG's willful and unlawful exercise of its market power over the market for Post-Release MP3 Players has excluded all suppliers of MP3 players, other than ATG, from sales of Post-Release MP3 players to Released Purchasers.

244.   ATG does not have a legitimate business justification for its exclusionary, predatory, and anticompetitive conduct.

245.   ATG's and SanDisk's anticompetitive actions have created a dangerous probability that ATG will achieve monopoly power in the market for Post-Release MP3 Players because ATG has already unlawfully achieved an economically significant degree of market power in that market and has effectively foreclosed new and potential entrants from entering the market or gaining their naturally competitive market shares.

246.   SanDisk's exclusive supply of Post-Release MP3 Players to ATG enables ATG's attempted monopoly in the market for Post-Release MP3 Players.  SanDisk improperly benefits from its contribution to ATG's attempted monopoly through ATG's exclusive, market-restrained sales of SanDisk Post-Release MP3 Players.

247.   ATG's and SanDisk's anticompetitive actions have created substantial barriers to entry by competitors into the market for Post-Release MP3 Players – namely, the prohibitive switching costs imposed upon Released Purchasers desiring to purchase a Post-Release MP3 Player from any source other than ATG.

248.    Plaintiffs and the Released Purchaser National Class have been injured in fact by ATG's unlawful attempted monopolization because they have been deprived of the choice of purchasing lower cost and/or better quality alternatives to ATG's SanDisk Post-Release MP3 Players.

249.    ATG and SanDisk's conduct associated with the sale of Post-Release MP3 Players constitutes unlawful attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, which has directly and proximately caused economic injury to Plaintiffs and the Released Purchaser National Class in an amount to be proven at trial.

250.    Pursuant to 15 U.S.C. § 15, Plaintiffs and all other members of the Released Purchaser National Class are entitled to recover from ATG and SanDisk treble damages and attorney's fees for the above-described violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## COUNT XIII
### Conversion
### (On Behalf of the Released Purchaser National Class)

251.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

252.    Plaintiffs and all other members of the Released Purchaser National Class had the right to possess the music downloads that they had purchased while incarcerated at the time that they were released from incarceration.

253.    Through their actions, ATG and SanDisk, have wrongfully exercised dominion and control over the music downloads and have willfully and intentionally denied Plaintiffs and all other members of the Released Purchaser National Class possession of, and the right to use and enjoy, their property.  Plaintiffs and the Released

Purchaser National Class have been damaged as a result of ATG and SanDisk's conversion, as they have been deprived of the value, use, and enjoyment of their property.

254.    ATG and SanDisk's actions have caused Plaintiffs and all other members of the Released Purchaser National Class loss of their property and, as a result, Plaintiffs and all other members of the Released Purchaser National Class have been damaged in an amount to be determined at trial.

**COUNT XIV**
**Unconscionability**
**(On Behalf of the Released Purchaser National Class**
**and the Incarcerated National Class)**

255.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

256.    ATG's policies and practices alleged herein are procedurally and substantively unconscionable.

257.    Considering the great business acumen and experience of ATG in relation to Plaintiffs, the Released Purchaser National Class, and the Incarcerated National Class, the great disparity in the parties' relative bargaining power, the inconspicuousness, incomprehensibility, and/or omission of the contract terms at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risk between the parties, and similar public policy concerns, these terms are unconscionable and, therefore, unenforceable as a matter of law.

258.    In addition, the imposition of the charges alleged herein, including, inter alia, deinstitutionalization fees, is itself unconscionable, as such charges are not reasonably related to ATG's cost of deinstitutionalizing the MP3 players.

259.     In addition, ATG's policy and practice of denying released inmates possession of their Purchased Music Collection (i.e., up to $2,700 worth of MP3 audio files) unless they first purchase the SanDisk Post-Release MP3 Player from ATG within one year of their release, is unconscionable.

260.     Plaintiffs and the members of the Released Purchaser National Class and the Incarcerated National Class have sustained damages as a result of ATG's unconscionable policies and practices as alleged herein in an amount to be determined at trial.

## COUNT XV
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (On Behalf of the State Subclasses)

261.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

262.     Implied into every contract is a covenant of good faith and fair dealing that requires the parties to act in good faith in their dealings with each other.  This is especially true of the party that is in a stronger position and has the ability to exercise discretion.  That discretion is required to be exercised in good faith.

263.     Defendants have a duty to exercise good faith and fair dealing when selling Prison-Restricted MP3 Players to consumers, including Plaintiffs and all other members of the State Subclasses.

264.     Defendants violated the implied covenant of good faith and fair dealing by engaging in the misleading and deceptive acts and practices described above, and thus deprived Plaintiffs and all other members of the State Subclasses of the benefit of their bargain.

265.    As a consequence of the foregoing, Defendants are liable to Plaintiffs and all other members of the State Subclasses for damages in an amount to be determined at trial.

### COUNT XVI
### Unjust Enrichment
### (On Behalf of the Released Purchaser National Class
### and the Incarcerated National Class)

266.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

267.    As set forth above, Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Plaintiffs and all other members of the Released Purchaser National Class and Incarcerated National Class.

268.    When Plaintiffs and all other members of the Released Purchaser National Class and the Incarcerated National Class paid Defendants, they reasonably believed that they were legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

269.    Defendants have been enriched at the expense of Plaintiffs and all other members of the Released Purchaser National Class and the Incarcerated National Class by virtue of the payments made to which Defendants were not entitled, which constitute a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust scheme.

270.    But for Defendants' wrongful conduct, they would not have received and continue to receive payments from Plaintiffs and all other members of the Released Purchaser National Class and the Incarcerated National Class.

271.    Defendants' retention of the payments violates fundamental principles of justice, equity, and good conscience.

272.    By virtue of the foregoing, Defendants have been unjustly enriched in an amount to be determined at trial.

## COUNT XVII
## Michigan Consumer Protection Act, MCL § 445.901, *et seq.*
### (On Behalf of the Michigan Subclass)

273.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

274.    The Michigan Consumer Protection Act prohibits "Unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce."  MCL § 445.903.

275.    Plaintiff Scott Irwin and members of the Michigan Subclass purchased "goods or services primarily for personal, family or household purposes" as alleged herein.

276.    Defendants engaged in unfair, false, misleading, or deceptive acts or practices through the unlawful conduct alleged herein.

277.    As a result of Defendants' unfair, false, misleading, or deceptive acts or practices alleged herein, Plaintiff Scott Irwin and the members of the Michigan Subclass have suffered an ascertainable loss of money or property in an amount to be determined at trial.

## COUNT XVIII
## Michigan Statutory Conversion, MCL § 600.2919a
### (On Behalf of the Michigan Subclass)

278.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

279.   Plaintiff Scott Irwin and all other members of the Michigan Subclass, at all relevant times, owned and had the right to possess the music downloads that they had purchased while incarcerated at the time that they were released from incarceration.

280.   Through their actions, ATG and SanDisk have wrongfully exercised dominion and control over the music downloads and have willfully and intentionally denied Plaintiff Scott Irwin and all other members of the Michigan Subclass possession of, and the right to use and enjoy, their property. Plaintiff Scott Irwin and the Michigan Subclass have been damaged as a result of ATG and SanDisk's conversion as they have been deprived of the value, use, and enjoyment of their property.

281.   ATG and SanDisk concealed, embezzled, or converted the property of Plaintiff Scott Irwin and the Michigan Subclass for their own use in violation of MCL § 600.2919a.

282.   ATG and SanDisk's conduct as alleged herein constitutes a conversion of the music downloads of Plaintiff Scott Irwin and the Michigan Subclass.

283.   By reason of ATG and SanDisk's conversion, Plaintiff Scott Irwin and the Michigan Subclass have incurred substantial damages in the form of the value of the music downloads in their Purchased Music Collections, plus all consequential damages flowing from ATG and SanDisk's conversion.

284.     As a result of ATG and SanDisk's conversion, and pursuant to MCL § 600.2919a, Plaintiff Scott Irwin and all other members of the Michigan Subclass are entitled to recovery of three times the amount of the actual damages, plus costs and reasonable attorneys' fees, in addition to any other available rights or remedies.

**COUNT XIX**
**Kentucky Consumer Protection Act, KRS §§ 367.110** *et seq.*
**(On Behalf of the Kentucky Subclass)**

285.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

286.     The Kentucky Consumer Protection Act prohibits "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce."

287.     Plaintiff W. Curtis Shain and members of the Kentucky Subclass purchased "goods or services primarily for personal, family or household purposes" as alleged herein.

288.     Defendants engaged in unfair, false, misleading, or deceptive acts or practices through the unlawful conduct alleged herein.

289.     As a result of Defendants' unfair, false, misleading, or deceptive acts or practices alleged herein, Plaintiff W. Curtis Shain and the members of the Kentucky Subclass have suffered an ascertainable loss of money or property in an amount to be determined at trial.

**COUNT XX**
**Indiana Deceptive Consumer Sales Act, Ind. Code §§ 24-5-0.5-1** *et seq.*
**(On Behalf of the Indiana Subclass)**

290.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

291.    Defendants' practices alleged herein of selling MP3 players and music downloads (and other audio files) constitute a "consumer transaction" within Ind. Code Ann. § 24-5-0.5-2(a)(1), as it is "a sale … assignment, award by chance, or other disposition of an item of personal property … to a person for purposes that are primarily personal, familial, charitable, agricultural, or household, or a solicitation to supply any of these things."

292.    Each defendant is a "supplier" within § 24-5-0.5-2(3), because it is a "seller … who regularly engages in or solicits consumer transactions ….   The term includes a manufacturer, wholesaler, or retailer, whether or not the person deals directly with the consumer."

293.    Defendants engaged in "deceptive acts" within § 24-5-0.5-3 generally and § 24-5-0.5-3(a)(1) and (10) specifically by making the representations and omissions alleged herein.

294.    Defendants' actions were "incurable" within the meaning of § 24-5-0.5-2(a)(8), since it is "a deceptive act done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead …"

295.    The Court may increase damages for a willful deceptive act in an amount that does not exceed the greater of three times the actual damages of the consumer suffering the loss or $1,000. § 24-5-0.5.4(a)(1) and (2).

296.    Plaintiff Cedric Myles and the members of the Indiana Subclass are entitled to damages, together with interest, costs and attorney's fees pursuant to § 24-5-0.5.4(a)(1) and (2).

## COUNT XXI
### Violation of the Ohio Consumer Sales Practices Act ("OCSPA"),
### Ohio Rev. Code Ann. § 1345.01, *et seq.*
### (On Behalf of the Ohio Subclass)

297.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

298.    The CSPA is broad, applying to the sale of consumer goods "to an individual for purposes that are primarily personal, family, or household [uses]." § 1345.01(A). Accordingly, the conduct at issue falls within the scope of the CSPA.

299.    The CSPA prohibits unfair, deceptive, and unconscionable practices in consumer sales transactions. § 1345.02(A). The CSPA further provides that "a consumer" has a private cause of action for violations of the statute, and expressly allows for class actions. § 1345.09.

300.    Defendants have engaged in unfair, deceptive, and unconscionable practices by their misconduct alleged herein.

301.    Defendants acted in the face of prior notice that their conduct was deceptive, unfair or unconscionable, as it is firmly established that material omissions and misrepresentations concerning a product constitute a violation of the CSPA.

302.    As a direct and proximate result of Defendants' violations of the CSPA, Plaintiff Robert Spillman and other members of the Ohio Subclass have been injured.

## COUNT XXII
### Violation of New York's Consumer Protection Act
### New York General Business Law § 349
### (On Behalf of the New York Subclass)

303.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

304. Through their misconduct described above, Defendants have engaged in acts and/or practices that are deceptive or misleading in a material way and that resulted in injury to Plaintiff Calabro and the other members of the New York Subclass.

305. By reason of the foregoing, Defendants have violated New York General Business Law § 349 and decisional law prohibiting deceptive trade practices and consumer fraud, is liable to Plaintiff Calabro and the other members of the New York Subclass for the damages that they have suffered as a result of Defendants' actions, the amount of such damages to be determined at trial, plus attorneys' fees.

## COUNT XXIII
## CIVIL CONSPIRACY REGARDING COUNTS XIII-XV and XVII-XXII

306. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

307. As alleged more fully above, ATG and SanDisk have conspired to violate the rights of Plaintiffs and class members as described more fully in this Complaint and in counts XIII-XV and XVII-XXII above.

308. Defendants formed and operated an unlawful conspiracy to engage in conduct that violated the rights of the classes and sub-classes to this litigation. This conspiratorial conduct included, but is not limited to, conversion of plaintiffs' property, imposing unconscionable contracts and contractual terms, violating express and implied warranties owed to Plaintiffs, and violating the consumer protection acts of Michigan, Kentucky, Indiana, Ohio, and New York.

309. ATG and SanDisk's conduct described herein was malicious, willful, reckless, and/or wanton.

310.   Plaintiffs and class members were damaged and continue to suffer damages as a result of the specific acts carried out by ATG and SanDisk pursuant to the conspiracy.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests the following relief:

A.   The the Court certify this case as a class action and that it appoint Plaintiffs as class representatives and their counsel as class counsel;

B.   That the Court award Plaintiffs and the proposed Classes all appropriate relief, including, but not limited to:

i.   injunctive relief requiring that Defendants cease the practices effected by their conduct described herein;

ii.   declaratory relief, adjudging such practices unlawful;

iii.   monetary relief, whether by way of restitution or damages, including treble, multiple, or punitive restitution or damages where mandated by law or otherwise available, as well as statutory interest where mandated by law, and recovery of their attorneys' fees, costs, and expenses;

iv.   any civil penalties available pursuant to any remedy, including, but not limited to, State Consumer Protection Statutes and any attorneys' fees, costs, and exemplary damages available pursuant to such statutes;

v.   any and all equitable, exemplary, and punitive damages; and

vi.   any and all available equitable relief, including, but not limited to, restitution and disgorgement.

C.     That the Court grant such additional orders or judgments as may be necessary to prevent the unlawful practices complained of herein; and

D.     That the Court award Plaintiffs and the proposed Classes such other, favorable relief as may be available and appropriate under federal or state law, or at equity.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as those issues triable by jury.

Respectfully submitted,

Date: February 2, 2016          **THE MILLER LAW FIRM, P.C.**

*/s/ E. Powell Miller*_____
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Richard L. Merpi (P75255)
950 W. University Dr., Ste. 300
Rochester, MI 48307
Telephone: (248) 841-2200
epm@millerlawpc.com
ssa@millerlawpc.com
rlm@millerlawpc.com

**COHEN LAW GROUP, P.C.**          **ALL COUNSEL, P.C.**
Brian S. Cohen, Esq.               Andrew L. Lee, Esq.
(*pro hac vice forthcoming*)       (*pro hac vice forthcoming*)
Email: brian@cohenlg.com           Email: alee@all-counsel.com
10 East 40th Street, 46th Floor    21 West 45th Street, Suite 301
New York, NY 10016                 New York, NY 10036
Telephone: (212) 726-4436          Telephone: (212) 541-2429

***Counsel for Plaintiffs and the Putative Classes***