UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

W. CURTIS SHAIN, SCOTT IRWIN,
ROBERT SPILLMAN, CEDRIC MYLES,
and ANTHONY CALABRO, on behalf
of themselves and all others similarly
situated,

                                           Civil Case No. 16-10367
           Plaintiffs,                  Honorable Linda V. Parker

v.

ADVANCED TECHNOLOGIES GROUP, LLC
and SANDISK CORPORATION,

           Defendants.
_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS UNDER RULE 12(b)(6) AND DENYING AS MOOT DEFENDANTS' MOTION TO DISMISS UNDER RULE 12(b)(1)**

       This is a putative class action lawsuit filed by released Federal Bureau of Prison ("BOP") inmates on behalf of themselves and current and released BOP inmates who purchased MP3 players and music or other audio files during their incarceration. In a twenty-three count complaint, filed February 2, 2016, Plaintiffs assert claims against Defendants under the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, as well as various common law and state law claims. Now the Court must address the viability of those claims, as Defendants Advanced Technologies Group, LLC ("ATG") and SanDisk Corporation ("SanDisk") (collectively

"Defendants") have filed a motion to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6).[1]

## I.   Standard for Rule 12(b)(6) Motion to Dismiss

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of

the complaint.  *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134

(6th Cir. 1996).  Under Federal Rule of Civil Procedure 8(a)(2), a pleading must

contain a "short and plain statement of the claim showing that the pleader is

entitled to relief."  To survive a motion to dismiss, a complaint need not contain

"detailed factual allegations," but it must contain more than "labels and

conclusions" or "a formulaic recitation of the elements of a cause of action . . .."

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A complaint does not

"suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.' "

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

As the Supreme Court provided in *Iqbal* and *Twombly*, "[t]o survive a

motion to dismiss, a complaint must contain sufficient factual matter, accepted as

_____

[1] Defendants also filed a motion to dismiss pursuant to Federal Rule of Civil
Procedure 12(b)(1) in which they argue that Plaintiffs lack standing to seek
injunctive or declaratory relief.  That motion, as well as Defendants' Rule 12(b)(6)
motion, have been fully briefed.  On February 8, 2017, the Court heard oral
argument for both motions and a decision on the motions is pending.  Because the
Court concludes that Defendants' Rule 12(b)(6) motion should be granted and
there is no right to relief absent a viable claim, the Court is denying as moot
Defendants' Rule 12(b)(1) motion.

2

true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.

In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). This presumption, however, is not applicable to legal conclusions. *Iqbal*, 556 U.S. at 668. Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

Ordinarily, the court may not consider matters outside the pleadings when deciding a Rule 12(b)(6) motion to dismiss. *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 88 (6th Cir. 1997) (citing *Hammond v. Baldwin*, 866 F.2d 172, 175 (6th Cir. 1989)). A court that considers such matters must first convert the motion to dismiss to one for summary judgment. *See* Fed. R. Civ. P 12(d). However, "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the

3

case and exhibits attached to [the] defendant's motion to dismiss, so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

## II.   Factual Background

The named plaintiffs are former BOP inmates who now reside in Kentucky, Michigan, Ohio, Indiana, or New York.  (Compl. ¶¶ 9-13.)  While incarcerated, Plaintiffs purchased MP3 players, which are "on the BOP-operated facility's 'Commissary List' of items for sale[.]"  (*Id.* ¶ 52.)  BOP allows its inmates to purchase MP3 players because it recognizes that music "help[s] inmates deal with issues such as idleness, stress and boredom associated with incarceration."  (*Id.* ¶¶ 20, 21, quotation marks omitted.)

As reflected in BOP's Program Statement 4500.11, titled "Trust Fund/Deposit Fund Manual" ("BOP Program Statement 4500.11"), BOP manages and operates the commissaries within its facilities.[2]  (*See* Defs.' Mot., Ex. A, ECF

---

[2] Without converting a Rule 12(b)(6) motion to dismiss to a motion for summary judgment under Rule 56, a court can take judicial notice of " '[p]ublic records and government documents available from reliable sources on the internet,' such as websites run by governmental agencies."  *U.S. ex. rel. Modglin v. DJO Global, Inc.*, 48 F. Supp. 3d 1362, 1381 (C.D. Cal. 2014) (quoting *Hansen Beverage Co. v. Innovation Ventures, LLC*, No. 08-cv-1166, 2009 WL 6597891, at *1 (S.D. Cal. Dec. 23, 2009)); *see also In re Wellburtin SR/Zyban Antitrust Litig.*, 281 F. Supp. 2d 751, 754 n.2 (E.D. Pa. 2003) (citing cases) ("The fact that an agency report is 'published' on the internet does not affect the Court's ability to take judicial notice of the contents of that report," and the Court may consider the information as a (cont'd …)

No. 19-2).  The Warden and designated staff at each BOP facility decides, within the guidelines set forth in BOP Program Statement 4500.11, what items to sell in the facility's commissary.  (*Id*. at Ch. 3.3, Pg ID 235.)  The guidelines allow for the sale of "the MP3 player identified by the Central Office, Trust Fund Branch" which "may only be ordered from the vendor identified by the Central Office, Trust Fund Branch, to ensure the special security features and interface with TRULINCS [BOP's Trust Fund Limited Inmate Computer System] function correctly."  (*Id*. at Ch. 3.3(f)(7), Pg ID 237.)  As outlined in BOP Program Statement 4500.11, for security reasons, BOP requires the MP3 players (referred to by Plaintiffs as "Prison-Restricted MP3 Players") sold with certain features disabled, such as the external memory slot and the integrated microphone.  (*Id*.; *see also* Compl. ¶ 21.)

In 2012, BOP and ATG signed a $5.15 million contract giving ATG the exclusive right to supply Prison-Restricted MP3 Players and MP3 music and audio files to BOP inmates.  (*Id*. ¶ 23.)  Around the same time, ATG and SanDisk entered into an agreement for SanDisk to supply exclusively the Prison-Restricted MP3 Players to ATG.  (*Id*. ¶ 28.)  Pursuant to this agreement, only one brand and

_____

(cont'd…)

matter of public record without converting a motion to dismiss to one for summary judgment.); *see also* Fed. R. Evid. 201.  BOP Program Statement 4500.11 is publicly available on BOP's website at https://www.bop.gov/policy/progstate/4500_011.pdf.

model of MP3 music player is available for sale as a Prison-Restricted MP3 Player:
SanDisk's Sansa Clip+.[3] (*Id.* ¶ 27.) SanDisk places the "physical and
technological locks and restrictions on the MP3 players it supplies, with the
specific knowledge and/or intent that those Prison-Restricted MP3 Players are sold
by ATG to inmates in BOP facilities." (*Id.* ¶ 28.)

The Prison-Restricted MP3 Players are not connected to the Internet.
(Compl. ¶ 21.) Instead, they can be used to download approved music and audio
files through TRULINCS. (*Id.*) Music audio files range in price of $.80 to $1.80
per song; the cost of other audio files (e.g. audiobooks) is significantly higher.
(Compl. ¶ 31.) Inmates can purchase as many as 1,500 songs to download onto a
Prison-Restricted MP3 player through TRULINCS. (*Id.* ¶ 30.) According to
BOP's Program Statement 4500.11, "[a]ll music sales are final" and "[a]ll
purchased music/media files must be stored on the MP3 player." (Defs.' Mot., Ex.
A at Ch. 14.10(g), Pg ID 342.) MP3 player sales are not final, however. (*Id.* at
Ch. 3.4(g), Pg ID 244.)

BOP operates TRULINCS. (*Id.* at Ch. 14.2, Pg ID 332.) The Trust Fund
Supervisor is responsible for administering, maintaining, and monitoring the

_____

[3] At the motion hearing, defense counsel informed the Court that the model of the
player has been updated over time but remains a SanDisk manufactured player.

system.  (*Id.*)  Inmates must "accept the Music/Media Terms of Use before accessing the [Music S]ervice" via TRULINCS.  (*Id.* at Ch. 14.10(g), Pg ID 342.)

In addition to purchasing and downloading copyrighted audio files, inmates use TRULINCS for many purposes, including: (a) sending and receiving secure electronic messages with BOP employees; (2) processing their trust account transactions; (3) communicating with approved members of the public using a secure electronic messaging interface (monitored by BOP staff); and (4) managing their contacts.  (Compl. ¶ 22.)  Inmates also use TRULINCS' Music Service to activate MP3 players purchased from the commissary and to re-validate the players.  (Defs.' Mot., Ex. A at Ch. 14.10(g), Pg ID 342.)  Prison-Restricted MP3 Players must be connected to TRULINCS and re-validated every 14 days or they will stop working.  (*Id.*; Compl. ¶ 26.)  As a result, when prisoners are released from BOP custody and no longer have access to TRULINCS, their Prison-Restricted MP3 Players soon will become inoperable and the released prisoners ("Released Purchasers") will lose access to the audio files purchased and downloaded to the players (i.e., their "Purchased Music Collections").  (Compl. ¶ 36.)  Plaintiffs allege that this consequence is not conveyed to inmates before or at the time they purchase a Prison-Restricted MP3 Player.  (*Id.* ¶ 37.)

Plaintiffs also allege in their Complaint that the only way to avoid this consequence is for Released Purchasers to buy a "Post-Release MP3 Player" from

7

ATG.  (*Id.* ¶ 36.)  SanDisk manufactures and is the exclusive supplier to ATG of this "Post-Release MP3 Player."  (*Id.* ¶ 39.)  According to Plaintiffs, ATG charges up to $110 for a Post-Release MP3 Player.  (*Id.* ¶ 42.)  Because "ATG will not restore any content to a third party player" (*id.* ¶ 44), Released Purchasers will lose access to their Purchased Music Collections if they buy any other MP3 player—of which, Plaintiffs allege, there are many in the open market sold by many different manufacturers.  (*Id.*)  Some of this information is conveyed to purchasers in the SanDisk Sansa Clip+ Manual ("Manual"), which inmates receive with their Prison-Restricted MP3 Players.[4]

The Manual reflects, however, that ATG is not selling Released Purchasers new MP3 Players unless their Prison-Restricted MP3 Players are lost or no longer working *and* out of warranty.  Instead, ATG offers to "deinstitutionalize" existing Prison-Restricted MP3 Players.  The Manual explains this "Post Release Deinstitutionalization" as follows:

> Within one year of being released from the Bureau of
> Prison facility, the purchaser may choose to send the
> player to ATG to deinstitutionalize it. This process

_____

[4] Plaintiffs refer to the Manual in their Complaint as "ATG's 'Post Release Deinstitutionalization Terms of Service for MP3 Players[.]' "  (Compl. ¶ 44.) Defendants attach the Manual to their Rule 12(b)(6) motion to dismiss.  As Plaintiffs refer to the Manual in their Complaint and it is central to their claims, the Court may consider it when ruling on Defendants' motion without converting the motion to one for summary judgment.  *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014).

> removes the device's special security features but
> preserves the music, audiobooks or other media ("User
> Data") that the purchaser had purchased during the last
> incarceration according to the TRULINCS database.

(Defs.' Mot., Ex. B, ECF No. 19-3.)  As the Manual further provides, Post Release

Deinstitutionalization costs $15.00, plus $10.00 shipping and handling.  (*Id*.)  If a

Prison-Restricted MP3 Player is lost or is not working and not under warranty,

ATG offers to provide a replacement device and restore the Released Purchaser's

Purchased Music Collection for a charge of $70.00, plus $10.00 shipping and

handling.  (*Id*.)

Plaintiffs do not allege in their Complaint that any named plaintiff or

putative class member purchased a Post-Release MP3 Player.  Plaintiffs assert in

response to Defendants' motion to dismiss, however, that named plaintiff Anthony

Calabro "purchased [this] product."  (Pls.' Resp. Br. at 20, ECF No. 23 at Pg ID

425.)  At the motion hearing, Plaintiffs' counsel informed the Court that Calabro's

Prison-Restricted MP3 Player was working and not lost when he was released.

Thus, what he purchased was the device's "deinstitutionalization[.]"

## III.   Applicable Law and Analysis

### A.    Plaintiffs' Antitrust Claims (Counts I-XII)

In Counts I-VIII of their Complaint, Plaintiffs allege that Defendants

engaged in unlawful tying, or conspiracy to engage in unlawful tying, in violation

of Section 1 of the Sherman Antitrust Act. In Counts IX-XII, Plaintiffs allege that

9

Defendants engaged in unlawful monopolization, attempted monopolization, or conspiracy to monopolize in violation of Section 2 of the Sherman Antitrust Act.

With respect to their tying claims, Plaintiffs assert that the purchase of a Post-Release MP3 Player is a prerequisite to a Released Purchaser's ability to retain access to his or her Purchased Music Collection. As such, Plaintiffs allege that Defendants unlawfully tie the purchase of a Prison-Restricted MP3 Player or audio files (i.e. the "tying" products) to the purchase of a Post-Release MP3 Player (i.e., the "tied" product"). With respect to their monopolization claims, Plaintiffs allege that Defendants' conduct has "exclusionary and anti-competitive effects with respect to the market for sales of Post-Release MP3 Players." (*See, e.g.*, Compl. ¶ 210.) As Plaintiffs explain in part:

> ATG utilizes its [contract with BOP to be the exclusive supplier of Prison-Restricted MP3 Players] to impose upon all purchasers of (1) its SanDisk Prison-Restricted MP3 Players and (2) its MP3 music and audio files making up the Purchased Music Collection an unforeseeable restriction of Released Purchasers' ability to retain ownership and possession of their Purchased Music Collection after release from prison unless they purchase a SanDisk Post-Release MP3 Player[] from ATG.

(*See, e.g.*, *id.*)

Defendants raise several arguments in support of their motion to dismiss Plaintiffs' antitrust claims. The Court finds it necessary to address only one of those arguments: Defendants' assertion that Plaintiffs lack antitrust standing.

10

The Supreme Court has articulated several factors relevant to whether a plaintiff has standing to bring an antitrust action. *Associated Gen. Contractors of Calif. v. Calif. State Council of Carpenters*, 459 U.S. 519, 537-45 (1983). The Sixth Circuit subsequently summarized those factors as:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983) (citing *Associated Gen. Contractors*, 459 U.S. at 537-45.) All five factors are meant to be balanced. *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 976 (6th Cir. 2000). Nevertheless, the Supreme Court has described the second factor—referred to as the "antitrust injury" requirement—as a "necessary, but not always sufficient" component of antitrust standing. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 484, 489 n.5 (1986). Thus, where a complaint fails to establish an antitrust injury, the court must dismiss it as a matter of law. *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc) (explaining that "antitrust standing is a threshold, pleading-stage inquiry and when a complaint by

11

its terms fails to establish this requirement we must dismiss it as a matter of law—lest the antitrust laws become a treble-damages sword rather than the shield against competition-destroying conduct that Congress meant it to be.").

To establish an antitrust injury, a plaintiff must show an " 'injury causally linked' " to an alleged anti-competitive practice and that the injury is " 'of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.' " *Cargill*, 479 U.S. at 109 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)); *see also NicSand*, 507 F.3d at 450 (quoting *Brunswick Corp.*, 429 U.S. at 489). "[E]ven though a claimant alleges that an injury is 'causally related to an antitrust violation,' it 'will not qualify as 'antitrust injury' unless it is attributable to an anticompetitive aspect of the practice under scrutiny.' " *NicSand*, 507 F.3d at 451 (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)). Thus, antitrust injury is lacking when the plaintiff's claimed injury results from governmental laws or regulations, rather than the defendant's alleged anticompetitive conduct. *See, e.g., CBC Companies, Inc. v. Equifax, Inc.*, 561 F.3d 569, 573 (6th Cir. 2009) (quoting *RSA Media, Inc. v. AK Media Grp., Inc.*, 260 F.3d 10, 13, 15 (1st Cir. 2001)) ("No cognizable antitrust injury exists where the alleged injury is a 'byproduct of the regulatory scheme' or federal law rather than of the defendant's business practices."); *Standfacts Credit Servs. v. Experian Info. Solutions, Inc.*, 294 F.

App'x 271, 272 (9th Cir. 2008) (holding that even where the defendants held "monopoly power in the wholesale market," the plaintiff resellers could not succeed on their antitrust claims where the monopoly power derived from federal requirements and not anticompetitive conduct); *In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006) (finding no antitrust injury to support the plaintiffs' claims that they were injured by increased prices for prescription drugs in the United States due to their inability to import less expensive drugs distributed by Canadian pharmacies where the absence of competition from Canadian sources was due to the prohibition on the importation of prescription drugs from Canada under federal law); *RSA Media*, 260 F.3d at 15 (finding no antitrust injury where the plaintiff's exclusion from the market for outdoor billboards was not a result of the defendant's anticompetitive conduct but a state regulatory scheme preventing new billboards from being built).

Defendants contend that the antitrust injuries Plaintiffs allege— having to purchase Post-Release MP3 players or lose their Purchased Music Collections and the inability to purchase MP3 players manufactured and sold by Defendants' competitors— result from the security restrictions BOP imposes for the MP3 players and audio files sold to inmates rather than Defendants' alleged anticompetitive conduct. Clearly, it is due to BOP policy rather than any anticompetitive conduct by Defendants that only ATG-supplied and SanDisk-

13

manufactured MP3 Players are sold to BOP inmates.  According to BOP Program Statement 4500.11, only "the MP3 player identified by the Central Office, Trust Fund Branch is sold in the Commissary" and "may only be ordered from the vendor identified by the Central Office, Trust Fund Branch …."  (Defs.' Mot., Ex. A at Ch. 3.3(f)(7), ECF No. 19-2 at Pg ID 237.)  BOP places these restrictions on the MP3 Players sold to inmates "to ensure the special security features and interface with TRULINCS function correctly."  (*Id.*)

These special security features, including the need to interface periodically with TRULINCS, also are attributable to BOP requirements.  In other words, it is because of BOP requirements that the MP3 players sold to inmates contain security features that render them inoperable and impede prisoners from accessing their Purchased Music Collections after their release.  (*See id*. at Ch. 3.3(f)(7) and Ch. 14.10(g), ECF No. 19-2 at Pg ID 237, 342.)  Specifically, BOP mandates that the MP3 Players sold to its inmates have certain features deactivated and that the "[p]layers must be connected to TRULINCS and re-validated every 14 days or they will stop working."  (*Id.*)

At the motion hearing, Plaintiffs' counsel appeared to concede these points. Nevertheless, counsel argued that BOP policies do not control Defendants' conduct after a purchaser of a Prison-Restricted MP3 Player leaves BOP custody.  In other words, Plaintiffs' counsel argued, BOP regulations do not prevent Defendants from

14

downloading a released inmate's Purchased Music Collection to a third-party MP3 player.[5]  Instead, Plaintiffs argue, Defendants use the technological locks to force released inmates to purchase their Post-Release MP3 Player.

The fact that purchasers of Prison-Restricted MP3 Players will lose access to their Purchased Music Collections if they do nothing after their release results from BOP Policy, however.  Defendants could do nothing and Plaintiffs still would suffer the complained of injury. It is *because of* BOP's security requirements that Defendants offer deinstitutionalization or a replacement MP3 player on which it downloads an inmate's Purchased Music Collection.

Plaintiffs contend that Defendants instead could access TRULINCS to transfer a Released Purchaser's music to a third-party MP3 player—an ability not supported by the facts in Plaintiffs' Complaint[6]— or use some more direct way to

_____

[5] Similarly, Plaintiffs argued in their response to Defendants' motion to dismiss that there is no factual basis to conclude that Defendants "**cannot** provide a Purchased Music Collection to a Released Purchaser by any means other than the 'deinstitutionalization' purchase of a SanDisk Post-Release MP3 Player from ATG."  (Pls.' Resp. Br. at 8, ECF No. 23 at Pg ID 413, emphasis in original.) Plaintiffs maintained that nothing in BOP policies or regulations "prohibit the use of third-party MP3 Players or other devices to access Purchased Music Collections **after** a person is released."  (*Id*., emphasis in original)  Plaintiffs asserted that "Defendants have the ability, but refuse, to provide Plaintiffs with their Purchased Music Collections by means other than the purchase of a SanDisk Post-Release MP3 Player from ATG …."  (*Id*.)

[6] As alleged in the Complaint, and highlighted in BOP Program Statement 4500.11, TRULINCS is "*BOP*'s secure computer interface" and BOP operates and controls (cont'd …)

15

download the music to a third-party MP3 player—which, at the motion hearing, Plaintiff's counsel speculated must be available. Even if Defendants could offer to download Plaintiffs' Purchased Music Collections to third-party players through either method, this overlooks the essential point that the need to do so *arises from BOP's restrictions* rather than Defendants' anti-competitive conduct. The Court does not understand the Sherman Act as requiring an entity to take action to remedy a barrier to competition created by governmental restrictions.

In short, BOP policy rather than any anti-competitive conduct by Defendants is the more likely basis for any injury Plaintiffs allegedly suffered. Plaintiffs fail to allege facts sufficient to support an antitrust injury.

### B.    Plaintiffs' Common Law & State Law Claims

#### 1.    Common Law Conversion and Michigan Statutory Conversion (Counts XIII and XVIII, Respectively)

Under the common law, conversion is "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins. Co. v. Allstate Ins. Co.*, 486 N.W.2d 600, 606 (Mich. 1992). "Conversion may occur when a party properly in possession of property uses it in an improper way, for an improper purpose, or by delivering it

_____

(cont'd…)
TRULINCS. (Compl. ¶¶ 21, 22, 106, emphasis added; *see also* Defs.' Mot., Ex B.)

without authorization to a third party." *Dep't of Agric. v. Appletree Mktg. LLC*, 485 Mich. 1, 779 N.W.2d 237, 244-45 (2010).

Michigan's conversion statute provides, in pertinent part:

> (1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorneys' fees:
>
> (a) Another person's stealing or embezzling property or converting property to the other person's own use.
>
> (b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled or converted.

Mich. Comp. Laws § 600.2919a.  In order to prevail on a claim for statutory conversion, a plaintiff must satisfy the elements of a common law conversion claim, as well as demonstrate that the defendant had "actual knowledge" of the converting activity.  *See Echelon Homes, LLC v. Carter Lumber Co.*, 694 N.W.2d 544, 547-48 (Mich. 2005) (holding that under Michigan's conversion statute, "constructive knowledge is not sufficient; a defendant must know that the property was stolen, embezzled, or converted.").

In their Complaint, Plaintiffs allege that Defendants engaged in conversion by exercising dominion and control over their Purchased Music Collections in

violation of Plaintiffs' ownership and possessory rights.  (*See, e.g.*, Compl. ¶ 253.)
Defendants seek dismissal of Plaintiffs' conversion claims, arguing that Plaintiffs
fail to allege any affirmative act by Defendants interfering with their Purchased
Music Collections and that "mere inaction is not enough."  (Defs.' Br. in Supp. of
Mot. at 32, ECF No. 19 at Pg ID 182, quoting *Wheeler & Clevenger Oil Co. v.
Doan*, No. 2:04-cv-0558, 2005 WL 1210995, at \*10 (S.D. Ohio May 20, 2005) and
18 Am. Jur. 2d Conversion § 21.)  Plaintiffs respond that Defendants cite only
unpublished, non-binding authority to support their argument that an affirmative
act is required to prove conversion.  Plaintiffs alternatively argue that even if an
affirmative act is required, they allege "Defendants erect[ed] a barrier between
Plaintiffs and their Purchased Music Collections.  Defendants require Plaintiffs to
pay money and purchase a San Disk Post-Release MP3 Player in order to access
the Purchased Music Collections."  (Pls.' Resp. Br. at 34, ECF No. 23 at Pg ID
439.)

"Some affirmative act on the part of the defendant is usually regarded as
necessary to constitute conversion."  18 Am. Jur. 2d Conversion § 21 (2d ed.
2016).  The plain language used by the Michigan courts to define conversion
expresses this requirement: "any *distinct act of dominion* wrongfully *exerte*d over
another's personal property ...."  *Aroma Wines & Equip., Inc. v. Columbian
Distribution Servs., Inc.*, 871 N.W.2d 136, 144 (Mich. 2015) (emphasis added and

18

internal quotation marks and citations omitted).  Contrary to Plaintiffs' assertion in their response brief, the allegations in their Complaint do not establish that *Defendants* "erect[ed] a barrier between Plaintiffs and their Purchased Music Collections."  Instead, as discussed in the preceding section, the alleged facts make clear that BOP regulations regarding MP3 players and MP3 audio files create the barrier.  Plaintiffs simply want Defendants to take action to remove that barrier.

Plaintiffs therefore fail to state viable claims for common law or Michigan statutory conversion.

## 2.   Unconscionability (Count XIV)

Unconscionability is not a basis for affirmative relief, but is a defense to the enforcement of a contract.  *See, e.g., Doe v. SexSearch.com*, 551 F.3d 412, 419-20 (6th Cir. 2008); *Knox v. Countrywide Bank*, 4 F. Supp. 3d 499, 513 (E.D.N.Y. 2014) (citing *Ng v. HSBC Mortg. Corp.*, No. 07-CV5434, 2011 WL 3511296, at *8 (E.D.N.Y. Aug. 10, 2011)) ("Under New York law, unconscionability is an affirmative defense to the enforcement of a contract. … A cause of action for unconscionability may not be used to seek affirmative relief."); *Newman v. Roland Machinery Co.*, No. 2:08-cv-185, 2009 WL 3258319, at *10-11 (W.D. Mich. Oct. 8, 2009) (examining decisions of several state and federal courts holding that unconscionability is an affirmative defense and does not give rise to an independent cause of action). As the Sixth Circuit stated in *SexSearch.com*:

19

> At common law, unconscionability is a defense against enforcement, not a basis for recovering damages. *See, e.g.*, Restatement (Second) of Contracts § 208 (1981) ("If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result."); *Bennett v. Behring Corp.*, 466 F. Supp. 689, 700 (S.D. Fla.1979) ("[T]he equitable theory of unconscionability has never been utilized to allow for the affirmative recovery of money damages."); *Johnson v. Long Beach Mortg. Loan Trust 2001-4*, 451 F. Supp. 2d 16, 36 (D.D.C. 2006) ("Plaintiff cannot recover compensatory damages under the common law doctrine of unconscionability.").

551 F.3d at 419-20 (6th Cir. 2008).  The cases Plaintiffs cite in response to Defendants' motion to dismiss affirm the use of unconscionability only as a defense to the enforcement of a contract.

As such, the Court is dismissing Plaintiffs' unconscionability claim.

### 3.   Breach of the Implied Covenant of Good Faith and Fair Dealing (Count XV)

Breach of the implied covenant of good faith and fair dealing is not an independent cause of action, but is part of a breach of contract claim, in each of the states whose laws could apply in this case.  *See, e.g., Frisch v. Nationwide Mut. Ins. Co.*, 553 F. App'x 477, 482 (6th Cir. 2014) (applying Ohio law and affirming dismissal of breach of implied covenant claim); *Sea Carriers Corp. v. Empire Programs, Inc.*, 488 F. Supp. 2d 375, 380 (S.D.N.Y. 2007) (stating New York

20

law); *Peacock v. Damon Corp.*, 458 F. Supp. 2d 411, 419 (W.D. Ky. 2006) (stating

Kentucky law); *McLiechey v. Bristol W. Ins. Co.*, 408 F. Supp. 2d 516, 522 (W.D.

Mich. 2006) (applying Michigan law).  As the Sixth Circuit explained in *Frisch*

with respect to Ohio law:

> Ohio law does not recognize a stand-alone claim for breach of the implied covenant of good faith and fair dealing. *Wendy's Int'l, Inc. v. Saverin*, 337 Fed. Appx. 471, 476 (6th Cir.2009) ("[T]he duty does not create an independent basis for a cause of action."); *Lakota Local Sch. Dist. Bd. of Educ. v. Brickner*, 108 Ohio App.3d 637, 671 N.E.2d 578, 584 (1996) ("[Our cases do not] stand[ ] for the proposition that a breach of good faith exists as a separate cause of action from a breach of contract claim. Instead, they recognize the fact that good faith is part of a contract claim and does not stand alone."). Although Ohio law does recognize that "every contract contain[s] an implied duty for the parties to act in good faith and to deal fairly with each other," *Littlejohn v. Parrish*, 163 Ohio App.3d 456, 839 N.E.2d 49, 54 (2005), this duty "is part of a [breach of] contract claim and does not stand alone." *Lakota*, 671 N.E.2d at 584.

553 F. App'x at 482.  Plaintiffs, however, never identify a contract between

themselves and Defendants in their Complaint.

  Accordingly, the Court is dismissing this claim.

### 4.  Unjust Enrichment (Count XVI)

  Under the doctrine of unjust enrichment, " 'a person who has been unjustly

enriched at the expense of another is required to make restitution to the other.' "

*Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 904 (Mich. Ct. App.

2006) (quoting *Michigan Educ. Emps. Mut. Ins. Co. v. Morris*, 596 N.W.2d 142

(Mich. 1999)) (brackets and additional quotation marks and citation omitted).

However, "not all enrichment is necessarily unjust in nature." *Id*.

In support of their unjust enrichment claim, Plaintiffs allege:

267. As set forth above, Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Plaintiffs and all other members of the Released Purchaser National Class and Incarcerated National Class.

268. When Plaintiffs and all other members of the Released Purchaser National Class and the Incarcerated National Class paid Defendants, they reasonably believed that they were legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

269. Defendants have been enriched at the expense of Plaintiffs and all other members of the Released Purchaser National Class and the Incarcerated National Class by virtue of the payments made to which Defendants were not entitled, which constitute a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust scheme.

270. But for Defendants' wrongful conduct, they would not have received and continue to receive payments from Plaintiffs and all other members of the Released Purchaser National Class and the Incarcerated National Class.

271. Defendants' retention of the payments violates fundamental principles of justice, equity, and good conscience.

Plaintiffs' allegations fail to identify which "payments" are at issue or why it is unjust for Defendants to retain those payments. It is not evident from the factual allegations in the Complaint that Plaintiffs made any payments *to Defendants*.

Nevertheless, even if Plaintiffs made payments to Defendants, Plaintiffs received what they bargained for. The fact that Plaintiffs' Prison-Restricted MP3 Players may have become inoperable or they risked losing (or lost) access to their Purchased Music Collections is not the result of some unjust act of Defendants. Rather, it is a result of BOP's policies requiring security features on the Prison-Restricted MP3 Players that render them inoperable after release, thereby severing a Released Purchaser's access to his or her Purchased Music Collection on the player. It also results from BOP policies requiring that "[a]ll purchased music/media files must be stored on the MP3 player" and restricting the download of files to authorized MP3 players, only.

In short, the allegations in Plaintiffs' Complaint fail to plead a viable unjust enrichment claim.

### 5.   State Consumer Protection Claims (Counts XVII, XIX-XXII)

In their Complaint, Plaintiffs allege violations of the following state consumer protection statutes: (a) the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.901 *et seq.* ("MCPA"); (b) the Kentucky Consumer Protection Act, KRS §§ 267.110 *et seq.* ("KCPA"); (c) the Indiana Deceptive Consumer Sales

23

Act, Ind. Code §§ 24-5-0.5-1 *et seq.* ("IDCSA"); (d) the Ohio Consumer Sales

Practices Act, Ohio Rev. Code Ann. §§ 1345.01 *et seq.* ("OCSPA"); and (e) New

York General Business Law § 349.  Defendants argue that all of these claims are

subject to dismissal based on Plaintiffs' failure to allege misleading or deceptive

conduct in satisfaction of Rule 8 of the Federal Rules of Civil Procedure and

because Plaintiffs' allegations are pled "on information and belief".  Defendants

make additional arguments in support of dismissal that are relevant to some but not

all of these consumer protection claims.

In each of their consumer protection law claims, Plaintiffs incorporate their

earlier allegations and then assert something to this effect: "Defendants engaged in

unfair, false, misleading, or deceptive acts or practices through the unlawful

conduct alleged herein."[7]  (Compl. ¶¶ 276, 288 (Michigan and Kentucky claims).)

As Defendants argue, these allegations are insufficient to satisfy Rule 8.

Defendants are left to guess which of their alleged improper acts support these

claims.

---

[7] For their claim under Indiana law, Plaintiffs allege, "Defendants engaged in 'deceptive acts' within [the Indiana statute] specifically by making the representations and omissions alleged herein."  (Compl. ¶ 293.)  For their claim under Ohio law, Plaintiffs allege, "Defendants have engaged in unfair, deceptive, and unconscionable practices by their misconduct alleged herein."  (*Id*. ¶ 300.) Finally, for their claim under New York law, Plaintiffs allege, "Defendants have engaged in acts and/or practices that are deceptive or misleading in a material way…" (*Id*. ¶ 304.)

In response to Defendants' motion, however, Plaintiffs state that the conduct

forming the basis for these claims is:

> The Complaint alleges in detail that Defendants do
> not disclose until after they sell SanDisk Prison-
> Restricted MP3 Players and music and audio files to
> inmates the material fact that they will lose access to
> their Purchased Music Collection unless they purchase
> SanDisk Post-Release MP3 Players from ATG.
> Defendants do not provide inmates with the Warranty or
> Agreements until after they sell SanDisk Prison-
> Restricted MP3 Players to inmates. Defendants do not
> disclose to inmates that they will revoke the balance of
> the one-year warranty, disclaim the manufacturer's
> warranty altogether, and/or shorten the duration of the
> implied warranty of merchantability to a period of only
> sixty (60) days from the date of so-called
> "deinstitutionalization" until after they sell SanDisk
> Prison-Restricted MP3 Players to inmates. When
> Defendants eventually do make such disclosures, to the
> extent, arguendo, they are not meaningless, the Warranty,
> Agreements, and Post-Release Terms are single-spaced
> documents containing impermissibly tiny and ambiguous
> terms and are wholly inadequate and ineffective for
> members of the putative Classes. (Compl. ¶¶ 52-81)
>
> The foregoing material omissions deprive inmates of the
> opportunity to either decline the transactions at issue or,
> in the alternative, to manage their music purchases in an
> informed and prudent manner throughout their
> incarceration. …

(Pls.' Resp. Br. at 39-40, ECF No. 23 at Pg ID 445-46.)  While Plaintiffs still fail

to link their allegations with the elements of their claims and explain how any

purported act or practice violates a particular statute, the Court assumes Plaintiffs

could remedy this defect in an amended pleading.  Nevertheless, necessary

elements to show a violation of the alleged consumer protection laws remain missing.

More specifically, under the Michigan, Indiana, and Ohio consumer protection statutes, a plaintiff alleging a violation based on material misrepresentations or omissions must show reliance. *Temple v. Fleetwood Enters., Inc.*, 133 F. App'x 254, 265 (6th Cir. 2005) ("To make out a prima facie claim under the [Ohio act], a plaintiff must 'show a material misrepresentation, deceptive act or omission' that impacted his decision to purchase the item at issue."); *In re OnStar Contract Litig.*, 278 F.R.D. 352, 378 (E.D. Mich. 2011) (stating that there is "no dispute" that individuals asserting MCPA claims "must establish reliance"); Ind. Code § 24-5-0.5-4 (a person "relying upon [a] deceptive act may bring" an IDCSA claim). Defendants argue that Plaintiffs' claims under these states' laws are subject to dismissal because Plaintiffs fail to allege reliance.  For example, to the extent Plaintiffs' claims are based on the failure to disclose limitations of the Prison-Restricted MP3 Players, Plaintiffs do not allege that they were led to believe before the purchases that no such limitations would apply or that they would not have purchased the players had they known of the limitations beforehand.  To the extent Plaintiffs' claims are based on the limitations on the warranties or the insufficiency of those disclosures, Plaintiffs were not provided with that documentation until after their purchase and they do not allege that, when

purchasing the MP3 players, they had a contrary belief as to what the warranties, disclosures, or terms of service would be.

Plaintiffs have responded to Defendants' reliance argument only as it pertains to Michigan law, and then only to argue that reliance is not a required element rather than to show that they adequately plead facts showing reliance. The Court therefore presumes Plaintiffs concede Defendants' argument with respect to the Indiana and Ohio statutes. *See Mekani v. Homecomings Fin., LLC*, 752 F. Supp. 2d 785, 790 n.2 (E.D. Mich. 2010) (stating that where a plaintiff fails to dispute the arguments a defendants makes for dismissal of a claim, "the Court assumes he concedes this point and abandons the claim"); *Bazinski v. JPMorgan Chase Bank, N.A.*, No. 13-14337, 2014 WL 140523, at *2 (E.D. Mich. 2014) ("Claims left to stand undefended against a motion to dismiss are deemed abandoned.").

As to Michigan's statute, Plaintiffs cite to *Dix v. American Bankers Life Assurance Co. of Florida*, 415 N.W.2d 206, 209 (Mich. 1987), to support their contention that reliance is not a required element. In *Dix*, however, the Michigan Supreme Court did not hold that reliance is not a requirement to prove a violation of the MCPA. Instead, the Court held only that in a class action proceeding under the statute, "members of [the] class … need not *individually* prove reliance on the alleged misrepresentations. It is sufficient if the class can establish that a

27

reasonable person would have relied on the representations." 415 N.W.2d at 209, emphasis added.  Thus, while *Dix* holds that "class allegations can be based on what a reasonable person would have relied upon, a named plaintiff bringing a putative class action under the MCPA must still allege actual reliance."  *In re Sony Gaming Networks and Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 997 (S.D. Calif. 2014); *see also, e.g., In re OnStar Contract Litig.*, 278 F.R.D. 352, 378 (E.D. Mich. 2011) (stating that there is "no dispute" that individuals asserting MCPA claims "must establish reliance").

In their Complaint, Plaintiffs fail to allege facts establishing their reliance on any particular material misstatement or omission by Defendants.  They do not explain in their response to Defendants' motion how they satisfy the reliance requirement.

Further, courts have construed Indiana's consumer protection act as not applying to omissions.  *Hughes v. Chattem, Inc.*, 818 F. Supp. 2d 1112, 1123 (S.D. Ind. 2011) (citing *Lawson v. Hale*, 902 N.W.2d 267, 274 (Ind. Ct. App. 2009)).  Similarly, the omission of facts does not constitute a violation of Michigan's consumer protection act absent a duty to disclose certain information to a consumer.  *Hendricks v. DSW Shoe Warehouse, Inc.*, 444 F. Supp. 2d 775, 782 (W.D. Mich. 2006); *Zine v. Chrysler Corp.*, 600 N.W.2d 384, 276 (Mich. Ct. App. 1999).  Defendants argue that while Plaintiffs refer to "unfair, false, misleading, or

28

deceptive acts or practices" in the Complaint, the only tangible examples Plaintiffs identify in support of their consumer protection act claims are omissions. Plaintiffs' response brief confirms that their state law consumer protection claims are based on omissions by Defendants. Plaintiffs do not allege a basis for imposing a duty on Defendants to disclose the alleged omitted facts.[8]

A consumer protection claim under New York's General Business Law requires a plaintiff to show: "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000) (citation omitted). The alleged deception must have occurred in New York.[9] *Goshen v. Mutual Life Ins. Co. of NY*, 774 N.E.2d 1190 (N.Y. 2002). Plaintiffs' allegations fail to explain how they were misled or deceived in a material way by Defendants and suffered injury as a result.

Finally, Defendants contend, and Plaintiffs concede, that Kentucky's consumer protection act generally requires a plaintiff to be in privity of contract

---

[8] Plaintiffs fail to respond to Defendants' argument that their claims under Indiana's and Michigan's consumer protection statutes also are subject to dismissal on this basis. Thus, this argument also may be deemed conceded. *See supra*
[9] It is not evident that the deception of any named plaintiff occurred in New York. Plaintiff Anthony Calabro was an inmate for almost a year at a BOP facility in New York; however, he was transferred to a facility in New Jersey for the remainder of his incarceration. (Compl. ¶ 13.) The Complaint neglects to assert the state in which Calabro was incarcerated when he was subjected to Defendants' alleged deceptive acts.

with the defendant.[10]  (Defs.' Br. in Supp. of Mot. at 46, ECF No. 19 at Pg ID 196,

citing *Tallon v. Lloyd & McDaniel*, 497 F. Supp. 2d 847, 854-55 (W.D. Ky. 2007);

Pls.' Resp. Br. at 45, ECF No. 23 at Pg ID 450, citing *Naiser v. Unilever United*

*States, Inc.*, 975 F. Supp. 2d 727, 743 (W.D. Ky. 2013).)  Relying on their

allegation that inmates purchase SanDisk Prison-Restricted MP3 Players from

ATG, Plaintiffs argue that they sufficiently allege privity of contract between

themselves and Defendants.

    These allegations do not establish privity of contract between Plaintiffs and

SanDisk, however.  Moreover, for the following reasons, the Court finds

implausible Plaintiffs' contention that they purchased Prison-Restricted MP3

Players or audio files directly from ATG.  Thus, the Court concludes that there is

no privity of contract between Plaintiffs and ATG.

    In their Complaint, Plaintiffs do allege that they purchased Prison-Restricted

MP3 Players and audio files from ATG.  (*See, e.g.,* Compl. ¶¶ 2, 30.)  In response

to Defendants' motion, Plaintiffs contend that this meant the products were

purchased "directly from ATG."  (Pls.' Resp. Br. at 12, ECF No. 23 at Pg ID 417,

emphasis removed).  In support of a direct contractual relationship between

---

[10] As the Kentucky Supreme Court provided: " 'Privity of contract' is '[t]he
relationship between parties to a contract, allowing them to sue each other but
preventing a third party from doing so.' "  *Presnell Const. Managers, Inc. v. EH
Const., LLC*, 134 S.W.3d 575, 579 (Ky. 2004) (citing Black's Law Dictionary
1217 (7th ed. 1999)).

themselves and ATG, Plaintiffs refer to the additional allegation in their Complaint that, "[a]ccording to data released by ATG, it has sold Prison-Restricted MP3 Players and MP3 audio files to populate those players to approximately forty percent (40%) of all federal inmates."  (*Id.*, quoting Compl. ¶ 32.)  According to Plaintiffs, further proof that inmates purchase the MP3 players directly from ATG can be found in BOP Policy Statement 4500.11: " 'This MP3 player may only be ordered from the vendor identified by the Central Office, Trust Fund Branch …' " (*Id.* at 14, quoting Defs.' Mot., Ex. A at Ch. 3.3(f)(7).)  Plaintiffs also refer to the description on ATG's website of its "Offender Management Suite" as including "Commissary Operations" and "Canteen Operations" and the BOP TRULINCS webpage directing users to "Troubleshoot Problems" using "Corrlinks Support" for certain issues.  A link on the webpage takes the user to www.corrlinks.com, which displays ATG's logo and claims to be the intellectual property of ATG.

When ruling on a motion to dismiss, the court's "plausibility analysis" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.  Undoubtedly, this Court's judicial experience and common sense informs it that ATG does not sell Prison-Restricted MP3 Players and MP3 audio files directly to inmates.  As BOP Policy Statement 4500.11 reflects, every aspect of the prison environment is highly controlled by its operating entity—here BOP.   Thus, *BOP* sells MP3 players to its

31

inmates through its commissaries, just at it sells the various other items listed for purchase (e.g., toothpaste, stamps, snacks, pens, and clothing).  Plaintiffs in fact acknowledge in their Complaint that the Prison-Restricted MP3 Players are offered for sale to inmates by being included "on the *BOP-operated* facility's 'Commissary List' …"  (Compl. ¶ 52, emphasis added.)  While the wording of Plaintiffs' allegation suggests that ATG is responsible for including the MP3 players on that list,[11] common sense dictates that BOP—not ATG or any other outside vendor whose goods are available at the commissary—decides what items are sold to inmates.

With respect to audio files, the allegations in Plaintiffs' Complaint contradict any assertion that Defendants sell those files directly to inmates.  Specifically, Plaintiffs allege in the Complaint that audio files are downloaded only "through BOP's secure computer interface known as [TRULINCS]."  (Compl. ¶¶ 21, 30.) BOP Program Statement 4500.11 provides that TRULINCS is operated and controlled by BOP.  (Defs.' Mot. Ex. A at Chpt.14, ECF NO. 19-2 at Pg ID 332.) ATG may have designed and sold the "Offender Management Suite" software enabling BOP to operate TRULINCS (and thus it may provide technical support

---

[11] The full sentence reads, "ATG offers SanDisk Prison-Restricted MP3 Players for sale by including the item on the BOP-operated facility's "Commissary List" of items for sale, which also lists other items available for purchase by inmates such as toothpaste, stamps, snacks, pens, and clothing, among others."  (Compl. ¶ 52.)

when users experience certain issues with the program), but this does not mean that ATG operates, controls, or sells audio files through TRULINCS.[12]  But even assuming ATG sells audio files to inmates through TRULINCS, Plaintiffs fail to allege a material misstatement or omission by ATG in connection with those sales.

In short, the facts do not show any privity of contract between Plaintiffs and Defendants to support Plaintiff's claim under Kentucky's consumer protection act.

For these reasons, the Court is dismissing Plaintiff's claims under the consumer protection statutes of Michigan, Kentucky, Indiana, Ohio, and New York.

### 6.    Civil Conspiracy

In their final count, Plaintiffs allege Defendants conspired to commit the common law and state law violations addressed above, except unjust enrichment. A claim alleging civil conspiracy cannot survive in the absence of a valid, underlying cause of action.  *Rondigo, LLC v. Twp. of Richmond, Mich.*, 522 F. App'x 283, 287 (6th Cir. 2013).  Having concluded that Plaintiffs' common law

---

[12] ATG could sell the Post-Release MP3 Players directly to released BOP inmates; but, nowhere in the Complaint do Plaintiffs allege that any named plaintiff (or even putative class member) purchased a Post-Release MP3 Player.  Moreover, the conduct forming the basis of Plaintiff's consumer protection law claims relates to the sale of the Prison-Restricted MP3 Players and audio files, not the Post-Release MP3 Players.

and state law claims are subject to dismissal, the Court also concludes that

Plaintiffs' civil conspiracy claim must be dismissed.

## IV.   Conclusion

To summarize, any injury Plaintiffs claim in this action is a byproduct of

BOP's rules for its MP3 program rather than Defendants' alleged anti-competitive

conduct.  Plaintiffs were limited to purchasing one brand and model of MP3 player

with certain security features because this is what BOP requires.  Per BOP policy,

Plaintiffs were allowed to access and download audio files to authorized MP3

players only through TRULINCS, which BOP operates and manages.  The MP3

players will stop working shortly after a prisoner's release—and thus Released

Purchasers will lose access to their Purchased Music Collections—because BOP

requires the players to be connected to TRULINCS every two weeks to remain

operable.  Antitrust injury therefore is lacking to support Plaintiffs' Sherman Act

claims against Defendants.

Because BOP policies, rather than any affirmative act by Defendants, create

the barrier between released purchasers and their Purchased Music Collections,

Plaintiffs conversion and unjust enrichment claims also fail.  Plaintiffs' claims

alleging unconscionability and breach of the implied covenant of good faith and

fair dealing fail to state independent causes of action.  Plaintiffs do not allege facts

to support the necessary elements of their claims under the Michigan, Indiana,

Ohio, Kentucky, and New York consumer protection acts.  With the demise of these claims, Plaintiffs' civil conspiracy claim fails as well.

Accordingly,

**IT IS ORDERED** that Defendants' Motion to Dismiss Under Rule 12(b)(6) is **GRANTED**;

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss Under Rule 12(b)(1) is **DENIED AS MOOT**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: February 28, 2017

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, February 28, 2017, by electronic and/or U.S. First Class mail.

s/ Richard Loury
Case Manager